**Joyce L. WILLIAMS, et al., Appellants,**

v.

**Mark BAKER, M.D., et al., Appellees.**

**No. 84–1508.**

District of Columbia Court of Appeals.

Argued Nov. 19, 1985.
Decided April 7, 1988.

Rehearing En Banc Granted and Opinion Vacated June 21, 1988.

Linda S. Matlin, with whom Robert D. Sokolove, Washington, D.C., was on the brief, for appellants.

Laurence T. Scott, with whom Leo A. Roth, Washington, D.C., was on the brief, for appellees.

Before PRYOR, Chief Judge, BELSON, Associate Judge, and REILLY, Senior Judge.

REILLY, Senior Judge:

Despite the old maxim that "money brings no solace to those that grieve," there is a school of thought which would have us believe that the voice of lamentation can be stilled by judgments compensating the grievant for emotional distress. The established rule in this jurisdiction, however, is that "there can be no recovery for negligently caused emotional distress, mental disturbance, or any consequences thereof, where there has been no accompanying physical injury." *District of Columbia v. Smith,* 436 A.2d 1294, 1296 (D.C. 1981), *citing Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980); *Perry v. Capital Traction Co.,* 59 App.D.C. 42, 44, 32 F.2d 938, 940, *cert. denied,* 280 U.S. 577, 50 S.Ct. 31, 74 L.Ed. 627 (1929).[1]

We are now urged to overrule this line of authority on the ground that it is an

---

1. See also the collection of authorities cited in our recent opinion, *Asuncion v. Columbia Hospital for Women,* 514 A.2d 1187 (D.C.1986).

archaic principle of torts law, repudiated in recent years by the appellate courts of numerous jurisdictions where it once prevailed. After examining the decisions upon which appellant relies, we are unpersuaded by the rationale set forth by the authors of the majority opinions in those cases, and decline to discard the rule which has long guided this court and its predecessors. Accordingly, we affirm the order granting summary judgment to the defendants on appellant's claim.[2]

According to the allegations of the complaint and supporting affidavits, the events which prompted appellant to bring an action for damages against Children's Hospital and Mark Baker, M.D., may be summarized as follows:

One August afternoon, appellant brought her son—then about three years old—to the emergency room of Children's Hospital, as she had observed such symptoms of illness as fever (102°), sore throat, and gagging. The little boy, while sitting in his mother's lap, was examined by a staff physician, Dr. Baker, who concluded that the child was suffering from a minor virus[3] which did not require hospitalization. He released the child to his mother's home care, prescribing a specified quantity of aspirin and other tablets.

Late that night, the child was seized by a coughing spell, then choking and loss of consciousness. Appellant summoned an ambulance to Capitol Hill Hospital where the symptoms, severe respiratory distress and stupor, were diagnosed as "acute epiglottitis."[4] The staff alleviated the child's inability to breathe by inserting a tube in his throat. He was transferred to Children's Hospital still in critical condition, placed in the intensive care unit for three days, and then treated for a further period of ten days in another part of the hospital.

■ Almost two years later, mother (appellant) and son, commenced an action by filing a complaint, captioned "negligence action for damages for medical malpractice and negligent infliction for emotional distress." The gravamen of the mother's claim—she demands the sum of $1,000,000 in damages—is that the asserted misdiagnosis of Dr. Baker was the product of a negligent examination, thereby causing appellant severe emotional distress from which she is still suffering.[5] She stresses the fact that she was with her son throughout the episode and stayed at the hospital where her son was confined during his subsequent medical emergency and treatment.

In describing the lasting effects of her emotional distress, appellant specifies, *inter alia*, that after being told that her son had survived a life threatening episode, she continued to feel hysterical and worried "about the possibility of brain damage," paced the floor during the first night the child was in the hospital, could not sleep the following forty-eight hour period, refused to leave the hospital, and was unable to eat for several days. For months after her son returned home, her anxiety and nervousness continued, manifesting itself in sleeplessness and digestive problems. She eventually sought out a psychiatrist to help her overcome her emotional distress.

After filing an answer, defendants below moved for summary judgment on the mother's claim, pointing out that it was predicated solely upon emotional distress or psychic injury as distinguished from physical inju-

2. As the motion for summary judgment was directed only at the right of appellant, Joyce Williams, to recover damages on the grounds stated in the complaint, the right of the complaintiff—the infant son of appellant—to pursue his claim is left undisturbed by this decision.

3. The nomenclature of the diagnosis was "herpangina from coxsackie virus."

4. Epiglottitis is defined as inflammation of the "epiglottis," which is "the lidlike cartilaginous structure overhanging the entrance to the larynx and serving to prevent food from entering the larynx and trachea while swallowing." DORLAND's ILLUSTRATED MEDICAL DICTIONARY 452 (26th ed. 1981).

5. In their answering brief, defendants below dispute any negligence in the first diagnosis. For the purpose of this appeal, however, we accept appellant's allegation of negligence, leaving that issue for ultimate determination by the trial court should the co-plaintiff pursue his claim.

ry. In granting the motion, the court gave no reasons for its conclusion, but presumably relied upon the line of authorities, *supra*, holding that there can be no recovery for negligent infliction of emotional or nervous distress. Pursuant to Super.Ct. Civ.R. 54(b), this order was certified by the trial judge as a final judgment. Upon such certification, the order became appealable even though it was a judgment which was final only as to one plaintiff.[6]

The rule against recovery for the consequences of negligent infliction of emotional distress, *e.g.*, fright, nervous shock, anxiety, grief, etc., was adopted at least ninety years ago in this jurisdiction, when its highest court reversed a jury award to a plaintiff injured in a trolley car collision to the extent that it was based upon an impairment of the nervous system. *Washington and Georgetown R.R. Co. v. Dashiell*, 7 App.D.C. 507, 514–15 (1896). That decision was cited and followed some thirty-four years later by the same court in the leading case of *Perry v. Capital Traction Co.*, *supra*, 59 App.D.C. at 42, 32 F.2d at 938. There, notwithstanding evidence that as a result of nervous shock when the collision occurred, the plaintiffs suffered from crying spells, headaches, loss of sleep, mental anguish, etc., the court affirmed a ruling forbidding jury consideration of damages for these ailments. According to the court:

> The reason underlying the rule announced in the Dashiell Case, 34 years ago (a rule supported by the great weight of authority), is that mere fright is easily simulated and difficult to disprove, and that impairment of the nervous system is of such an intangible character that there is no practical standard by which the extent of the impairment may be determined. Where there has been a substantial physical injury, medical testimony and common knowledge may furnish a guide for measuring the pain and suffering incidental to the inju-

ry; but when, as here, there has been no substantial physical injury, a jury ought not to be permitted to indulge in conjecture and speculation as to the effects of alleged nervous shock or fright.

*Id.* at 43–44, 32 F.2d at 939–40.

In 1966, the Federal Court of Appeals for this circuit clarified the *Perry* opinion by holding in an automobile negligence case (trial without a jury) that the trial court had erred in refusing to consider evidence that plaintiff's physical injuries (lacerations of left arm and injury to right shoulder, for which more than nominal damages were awarded) had given rise to a neurotic condition disabling her from continuing in employment, on the ground that the physical injury must be "substantial." *Parrish v. United States*, 123 U.S. App.D.C. 149, 357 F.2d 828 (1966) (per curiam). Thus, plaintiffs seeking damages for mental disorder need no longer plead or prove that the causative physical injury was substantial. *See dicta in Waldon v. Covington, supra*, 415 A.2d at 1076 n. 20; *Garber v. United States*, 188 U.S.App.D.C. 172, 173 n. 2, 578 F.2d 414, 415 n. 2 (1978).

The *Parrish* holding has led some litigants (including appellant here) to characterize the governing limitation on recovery for mental disorders in this jurisdiction as equivalent to the "impact" rule. Such rule has been depicted by critics as illogical and artificial, who point to decisions in other states where damages for consequential mental disturbances have been allowed where the physical injury is trivial, *e.g.*, a slight blow or jar, dust in the eye, smoke inhalation, and the like.[7] The rule in this jurisdiction cannot be assailed on this score, for the *Parrish* opinion requires more than minimal physical injury. As the court in that case put it—after noting that the trial court should have determined "whether appellant has established by *a preponderance of the evidence that her*

---

6. Under the rule announced in *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), this court, unless it is sitting en banc, is not authorized to overrule binding precedents establishing the law of this jurisdiction. In view of the certification and the voluminous brief submitted by appellant, however, we have examined the authorities cited to

determine whether such holdings provide any convincing reasons for departing from precedent.

7. For a collection of authorities, see Prosser & Keeton on Torts § 54, at 363–64 (5th ed. 1984).

*nervous troubles were attributable to the injuries* sustained in the accident"—the test is not whether the physical injury is substantial, but whether the "alleged psychiatric disorders are a *proximate result* of the physical injuries...." *Parrish, supra,* 123 U.S.App.D.C. at 150, 357 F.2d at 829 (emphasis supplied).

The District of Columbia was by no means the only jurisdiction to restrict the scope of claims for mental disorders not caused by physical injury resulting from the negligent conduct of another. Such claims, when first advanced, were deemed noncompensable in England,[8] New York,[9] Massachusetts,[10] and other industrial states.[11]

In denying recovery for physical ailments stemming from fright or nervous shock, several courts, in addition to the grounds expressed in the *Perry* and *Dashiell* cases, *supra,* reasoned that such illnesses are not the normal consequence of fright or other mental disturbance. The court in *Spade v. Lynn & Boston R.R. Co.,* 168 Mass. 285, 47 N.E. 88 (1897)—for generations cited as a "leading" case, perhaps because of the concurrence of Holmes, then the Chief Justice of Massachusetts—conceded that "[g]reat emotion may ... produce physical effects.... The action of the heart, the circulation of the blood ... as well as the nerves and the appetite, may all be affected." *Id.* at 288, 47 N.E. at 88–89. Notwithstanding, the court went on to say:[12]

It would seem, therefore, that the real reason for refusing damages sustained from mere fright must be something different; and it probably rests on the ground that in practice it is impossible satisfactorily to administer any other rule. The law must be administered in the courts according to general rules. Courts will aim to make these rules as just as possible, bearing in mind that they are to be of general application. But as the law is a practical science, having to do with the affairs of life, any rule is unwise if in its general application it will not as a usual result serve the purposes of justice. A new rule cannot be made for each case, and there must therefore be a certain generality in rules of law, which in particular cases may fail to meet what would be desirable if the single case were alone to be considered.

Rules of law respecting the recovery of damages are framed with reference to the just rights of both parties; not merely what it might be right for an injured person to receive, to afford just compensation for his injury, but also what it is just to compel the other party to pay. One cannot always look to others to make compensation for injuries received. Many accidents occur, the consequences of which the sufferer must bear alone. And in determining the rules of law by which the right to recover compensation for unintended injury from others is to be governed, regard must chiefly be paid to such conditions as are usually found to exist. Not only the transportation of passengers and the running of trains, but the general conduct of business and of the ordinary affairs of life, must *be done on the assumption that persons who are liable to to be affected thereby*

---

8. *Victorian Railways v. Coultas,* [1888] 13 App. Cas. 222. Appellant correctly points out that this holding was rejected in *Dulieu v. White & Sons,* [1901] 2 K.B. 669. In recent years, however, the British courts have apparently gone back to the rule which would deny recovery to appellant in this case. *See King v. Q.B. Phillips,* [1953] 1 Q.B. 429 (dismissing an appeal from a ruling against a plaintiff mother for recovery for shock when she heard her infant son scream as a taxi driver backed into the tricycle he was riding); *accord Bourhill v. Young,* [1943] App. Cas. 92 (semble).

9. *Mitchell v. Rochester Ry. Co.,* 151 N.Y. 107, 45 N.E. 354 (1896).

10. *Spade v. Lynn & Boston R.R. Co.,* 168 Mass. 285, 47 N.E. 88 (1897).

11. *E.g., West Chicago St. R.R. Co. v. Leibig,* 79 Ill.App. 567 (1898); *Miller v. Baltimore & Ohio R.R. Co.,* 78 Ohio St. 309, 85 N.E. 499 (1908).

12. In two appeals, which came before the same court shortly thereafter, the famous jurist analyzed and applied the *Spade* rule. *See Smith v. Postal Tele. Cable Co.,* 174 Mass. 576, 55 N.E. 380 (1899); *Homans v. Boston Elevated Ry.,* 180 Mass. 456, 62 N.E. 737 (1902).

*are not peculiarly sensitive, and are of ordinary physical and mental strength....*

We remain satisfied with the rule that there can be no recovery for fright, terror, alarm, anxiety, or distress of mind, if these are unaccompanied by some physical injury; and if this rule is to stand, we think it should also be held that there can be no recovery for such physical injuries as may be caused solely by such mental disturbance, where there is no injury to the person from without. The logical vindication of this rule is, that it is unreasonable to hold persons who are merely negligent bound to anticipate and guard against fright and the consequences of fright; and that this would open a wide door for unjust claims, which could not successfully be met.

*Id.* at 289–90, 47 N.E. at 89 (emphasis supplied).

These observations seem to reflect a classic principle in the law of torts, *viz.,* that a defendant's negligent conduct makes him liable for the foreseeable injuries to persons and property caused by the careless act, but not for its remote and unexpected consequences, even though caused thereby. This became a widely accepted rule, incorporated into the RESTATEMENT (SECOND) OF TORTS § 281 comment c (1965) as a result of Chief Judge Cardozo's opinion for the New York Court of Appeals in *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928). There the court was faced with an award of damages stemming from an explosion of fireworks due to careless handling by a transit guard of a package carried by a passenger running for a train. The court held that the jury could hold the railway liable for injuries incurred in the immediate zone of the explosion, but not for an injury sustained by a person standing at the far end of the station platform when some scales toppled by reverberations from the explosion fell upon her.

Although the *Palsgraf* doctrine was not formulated against the background of mental or nervous injury, its emphasis upon liability to persons within "the zone of danger" from a negligent act resulted in some state courts carving out an exception to the impact rule. Under this exception, persons who narrowly escaped injury or death in an accident caused by negligence and then suffered lasting effects from fright, have been held entitled to damages. This exception was adopted in the RESTATEMENT OF TORTS § 313 (1934), which provided:

If the actor unintentionally causes emotional distress to another, he is liable to the other for illness or bodily harm of which the distress is a legal cause if the actor

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

This particular revision of the RESTATEMENT was eventually accepted by the New York Court of Appeals, *Battalla v. State,* 10 N.Y.2d 237, 176 N.E.2d 729, 219 N.Y.S. 2d 34 (1961), overruling precedent established more than sixty years before.[13] In that case, a 4–3 decision, a majority held that a child (plaintiff) who became frightened and hysterical in a ski lift when a state park employee failed to lock his seat belt could recover damages from the consequential mental injuries negligently induced. Citing with approval the Holmes justification of the *Spade* rule, *supra,* which corresponded with the New York precedent, Judge Van Voorhis, joined by Chief Judge Desmond and Judge Dye, wrote a dissenting opinion.

Some of the observations in his dissent should give pause to those who contend the current rule in this jurisdiction should be abrogated:

At a time like the present, with constantly enlarging recoveries both in scope and amount in all fields of negligence law, and when an influential portion of the

---

**13.** *Mitchell v. Rochester Ry. Co., supra* note 9.

Bar is organized as never before to promote ever-increasing recoveries for the most intangible and elusive injuries, little imagination is required to envision mental illness and psychosomatic medicine as encompassed by the enlargement of the coverage of negligence claims to include this fertile field.

\*　\*　\*　\*　\*　\*

The problem involved in enlarging the scope of recovery in negligence, even in instances where, as here, an enlargement might be justified on purely theoretical grounds, is that, when once the door has been opened, the new and broader rule is in practice pressed to its extreme conclusion. Courts and juries become prone to accept as established fact that fright has been the cause of mental or physical consequences which informed medical men of balanced judgment find too complicated to trace. Once a medical expert has been found who, for a consideration, expresses an opinion that the relationship of cause and effect exists, courts and juries tend to lay aside critical judgment and accept the fact as stated.

*Battalla, supra,* 10 N.Y.2d at 243–44, 176 N.E.2d at 732–33, 219 N.Y.S.2d at 39–40 (Van Voorhis, J., dissenting) (citations and footnote omitted).

But even though decisions dispensing with the impact rule and permitting recovery for mental disturbance occasioned by an act placing the plaintiff in personal danger have gained support in the RESTATE- MENT, *supra,* the right asserted by appellant to recover for emotional distress from witnessing the injury (or even death) to a member of the family was expressly rejected by the American Law Institute in RE- STATEMENT (SECOND) of TORTS, *supra* (1965), by the addition of a new subsection to § 313, providing:

(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emo- tional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.

In order to make it clear that this provision included the consequences of the fright and horror suffered by a mother at seeing her child imperiled, the text contains the following explanation:

**Comment on Subsection (2):**

d. The rule stated in Subsection (1) applies only where the negligent conduct of the actor threatens the other with emotional distress likely to result in bodily harm because of the other's fright, shock, or other emotional disturbance, arising out of fear for his own safety, or the invasion of his own interests. It has no application where the emotional distress arises solely because of harm or peril to a third person, and the negligence of the actor has not threatened the plaintiff with bodily harm in any other way.

Thus, where the actor negligently runs down and kills a child in the street, and its mother, in the immediate vicinity, witnesses the event and suffers severe emotional distress resulting in a heart attack or other bodily harm to her, she cannot recover for such bodily harm unless she was herself in the path of the vehicle, or was in some other manner threatened with bodily harm to herself otherwise than through the emotional distress at the peril to her child.

*Id.* comment d.

In arguing against application of the impact-physical injury standard, as well as the zone of danger limitation set forth in the RESTATEMENT,[14] appellant urges us to follow *Dillon v. Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968), where a majority of the Supreme Court of California, in the words of appellant, became the

---

**14.** In both *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970) and *Schultz v. Barbenton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109 (1983), where majorities of the Pennsylvania and Ohio Supreme Courts overruled prior case law requiring impact, plaintiffs were in the zone of danger created by negligent drivers of other vehicles. Although these opinions are quoted with approval in appellant's brief, neither holding is helpful to her cause, for at no time was she placed in peril of death or bodily injury.

"first court of last resort to extend the duty of care for emotional harm beyond the perimeters of physical danger." In this case, the defendant's car struck and killed a small child, narrowly missing a sister who was with her. Both the sister and the mother, who was a few yards away but saw the crash, brought an action for emotional disorders suffered as a result of fright and shock. The trial court, on a motion for summary judgment, ruled that the sister's claim could go to trial but dismissed the mother's claim because she was not within the zone of danger.

On appeal, Judge Tobriner, in an opinion in which three of his colleagues joined (three others including Traynor, C.J., dissented), reversed the judgment against the mother. Disparaging a decision his own court had reached only five years before, where recovery was denied for nervous shock with consequent bodily illness induced by apprehension of danger or injury to a third person,[15] the opinion said:

> [T]he complaint here presents the claim of the emotionally traumatized mother, who admittedly was *not* within the zone of danger, as contrasted with that of the sister, who *may have been* within it. The case thus illustrates the fallacy of the rule that would deny recovery in the one situation and grant it in the other. In the first place, we can hardly justify relief to the sister for trauma which she suffered upon apprehension of the child's death and yet deny it to the mother merely because of a happenstance that the sister was some few yards closer to the accident. The instant case exposes the hopeless artificiality of the zone-of-danger rule. In the second place, to rest upon the zone-of-danger rule when we have rejected the impact rule becomes

even less defensible. We have, indeed, held that impact is not necessary (*Cook v. Maier* (1939) 33 Cal.App.2d 581, 584, 92 P.2d 434.) The zone-of-danger concept must, then, inevitably collapse because the only reason for the requirement of presence in that zone lies in the fact that one within it will fear the danger of *impact.* At the threshold, then, we point to the incongruity of the rules upon which any rejection of plaintiff's recovery must rest.

*Id.* at 733, 441 P.2d at 915–16, 69 Cal.Rptr. at 75–76.

After reviewing some of the authorities, including *Palsgraf,* the opinion emphasized that the foreseeability of risk is of primary importance in establishing the element of duty, and stated that a "[d]efendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance." *Id.* at 739, 441 P.2d at 919–20, 69 Cal.Rptr. at 79–80 (citations omitted).

Most authorities on the law of negligence would agree with the thesis that the liability of the tortfeasor should be limited to the likely or foreseeable risks of his breach or care. But in applying this principle, the opinion became seriously flawed by two factual assumptions, *viz.,* that if a child is the victim of a negligent automobile driver it is foreseeable that (1) its mother will be in such close proximity that she will witness the accident, and (2) the incidental fright and shock will cause physical injury to the mother. The first premise is based wholly upon a statement in the Prosser text,[16] and ignores the fact that children

---

**15.** *Amaya v. Home Ice, Fuel & Supply Co.,* 59 Cal.2d 295, 315, 379 P.2d 513, 525, 29 Cal.Rptr. 33, 45 (1963). Before *Amaya* was decided by the Supreme Court of California, the plaintiff's claim had been upheld by an intermediate appellate court in a lengthy opinion by Judge Tobriner. This decision was reversed in a 4–3 vote by the highest court. When *Dillon* reached that court five years later, Judge Tobriner and two others had replaced members of the court who had participated in the final *Amaya* decision. In writing for the majority in *Dillon,* the author advanced most of the reasons the highest court had previously repudiated. Thus, the overturn of *Amaya* is attributable to a change in judicial personnel rather than to any intervening change in law.

**16.** *See* PROSSER, *supra* note 7, § 54, at 366. A common thread which runs through the majority opinions in *Dillon v. Legg, supra,* and several of its progeny, *e.g., Dziokonski v. Babineau,* 375 Mass. 555, 380 N.E.2d 1295 (1978), *Corso v. Merrill,* 119 N.H. 647, 406 A.2d 300 (1979), is the seeming reliance of the authors of these opinions not upon their own observations of human nature, but upon the views of the late Professor W.L. Prosser, as expressed in the various editions of his textbook on torts. Yet despite his prestige as "Reporter," his advocacy of extending liability to victims of emotional distress arising from harm to a third person was rejected when the RESTATEMENT OF TORTS was revised in 1965 to include the paragraph previously noted. *See Dziokonski, supra,* 375 Mass. at

past the toddler stage who leave home to walk to school or to join the company of their playmates after school hours are very rarely accompanied by parents. The second is even more questionable, for even though shock and grief are predictable on the part of any mother who sees a catastrophe befall a child, the probability of such emotional distress creating any significant impairment of the functions of the body, mind, or nervous system upon a person of ordinary sensibility is slight.

Despite these considerations, the opinion then overruled such precedents as *Amaya* by holding that the "injuries" to the mother who witnessed the accident were foreseeable, but conceded that such injuries were less foreseeable (1) to parents not present at the scene of the accident but who learned later of the fate of the child, or (2) to bystanders who saw and were horrified by a vehicular accident, but were not closely related to the victim.[17]

Impressed by the basic rationale of the majority of the *Dillon* case, but obviously not by either of the foregoing limitations, some other courts, notwithstanding the disapproving paragraph excerpted from RESTATEMENT (SECOND), *supra,* have followed suit. Most notable was a Massachusetts holding overturning the long respected *Spade* rule, *Dziokonski v. Babineau,* 375 Mass. 555, 380 N.E.2d 1295 (1978). In that case a mother, accompanying in an ambulance a young daughter injured by an automobile accident, died of a heart attack; a few hours later her husband, upon learning of these events, suffered the same fate.

Although it could scarcely be argued that the negligent driver could foresee these deaths—neither parent even saw the accident—the court held that the estates of both decedents could maintain wrongful death actions against the driver. *See id.* at 569, 380 N.E.2d at 1303.

The Massachusetts court, in disparaging its early conclusion that claims for emotional distress damage could readily be manufactured or improperly expanded, nevertheless was at pains to mention the absence in the case before it of any "suggestion that the injuries to [plaintiffs] were contrived." *Id.* at 566, 380 N.E.2d at 1301. Yet, a neighboring state soon thereafter permitted an action by bereaved parents to go to trial where the only "injury" alleged was depression.[18] And in another state, where a cause of action for physical injury from grief was sustained, the victim mourned was not a member of the plaintiff's family, but a pet dog.[19]

These progeny of the *Dillon* decision illustrate the difficulty of placing any "logical" limits upon liability for negligent infliction of emotional distress. If the question of reasonable foreseeability and the degree of relationship between the third person and the plaintiff claiming an emotional impact are matters for the trier of fact—*e.g.,* a jury—as the *Dziokonski* opinion suggests, 375 Mass. at 568, 380 N.E.2d at 1302, the courts would be flooded with emotional disturbance litigation. It is the fear of such result which has led most of the courts in this country to adhere to the limitations of the impact or zone of danger

---

563, 380 N.E.2d at 1300. That the expansionist views of this learned writer have carried great weight with many courts cannot be gainsaid. In one case in this jurisdiction which broke new ground, his enthusiasm for extending claims for loss of consortium to persons without whose wives or husbands had been injured in accidents, led to the recognition of a cause of action here, which had previously been limited to suits for alienation of affections. *See Hitaffer v. Argonne Co.,* 87 U.S.App.D.C. 57, 183 F.2d 811, *cert. denied,* 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950).

17. *Dillon, supra,* 68 Cal.2d at 740–41, 441 P.2d at 920, 69 Cal.Rptr. at 80. The author of the opinion also quoted with approval an English appellate court in which it was held that a directed verdict was warranted against a plaintiff, a bystander who sued for physical injury incurred by the shock of witnessing an accident. The court explained:

The driver of a car or vehicle, even though careless, is entitled to assume that the *ordi-*

*nary frequenter* of the streets has sufficient fortitude to endure such incidents as may from time to time be expected to occur in them, including the noise of a collision and the sight of injuries to others, and is not to be considered negligent towards one who does not possess the customary phlegm.

*Id.* at 746, 441 P.2d at 924, 69 Cal.Rptr. at 84 (quoting *Bourhill v. Young,* [1943] App.Cas. 92, 117 (Porter, L.J.)).

18. *Corso v. Merrill, supra,* 119 N.H. 647, 406 A.2d 300 (1979). In a forceful dissent, Judge Grimes aptly noted that "the genie is now clearly out of the bottle and I can only hope that someone will find a way to get him back in." *Id.* at 660, 406 A.2d at 309 (Grimes, J., dissenting).

19. *Campbell v. Animal Quarantine Station,* 63 Haw. 557, 632 P.2d 1066 (1981).

rules. How some of the courts which have disparaged these holdings can argue that such fears are unfounded is puzzling, unless the authors of these opinions are completely oblivious to the enormously expanding scope of tort litigation, followed by startling increases in casualty insurance rates for medical practitioners and manufacturers.[20] In the case before us, appellant would have us not only adopt the *Dillon* approach, despite its questionable rationale, but go one step further.

There is no doubt of course that fright or grief—particularly the kind of grief which parents feel if a beloved child is the victim of sudden death or severe injury—are among the most disturbing emotions a parent can suffer. But is it not true that measurable or lasting damage to the functioning of the human system is the normal or foreseeable outcome of persons forced to undergo such trauma. Almost every parent can recall numerous episodes of acute anxiety as small children are overtaken by the onslaught of alarming diseases from which few youngsters either in infancy or of school age are immune, to say nothing of the injuries incurred when they are old enough to drive or engage in sports. Should parents be able to recover damages for such incidents of emotional distress if they can point to some deficiency in the medical treatment accorded a sick or injured child, the numbers of plaintiffs in malpractice actions against medical practitioners could increase dramatically.

■ In cases like *Dillon*, where a parent sees a child killed or mangled by an automobile, there is an element of sudden shock. Nothing of this sort happened here. The supposedly negligent diagnosis, the witnessing of which by appellant is the asserted cause of emotional harm, was certainly comforting rather than horrifying. The discovery several hours later of the child's distress and inability to breath may well have been startling, but at that time, the alleged tort had already been committed.

In sum, we perceive no valid reason in the facts adduced by appellant, nor in the authorities cited in her brief, for overruling the doctrines established by the courts of

this jurisdiction which bar recovery, even if we were free to do so.

*Affirmed.*

## ORDER

**PER CURIAM.**

On consideration of appellant's petition for rehearing en banc, and the response thereto; and it appearing that the majority of the judges of this court has voted to grant the petition for rehearing en banc, it is

ORDERED that appellant's petition for rehearing en banc is granted and that the opinion and judgment of April 7, 1988, are hereby vacated. It is

FURTHER ORDERED that the mandate issued April 29, 1988, is hereby recalled and the Clerk of the Superior Court is directed to transmit same to the Clerk of this court forthwith. It is

FURTHER ORDERED that the Clerk shall schedule this matter for argument before the court sitting en banc as soon as the business of the court permits. Counsel are hereby directed to provide ten copies of the briefs heretofore filed to the Clerk on or before July 5, 1988.

---

**20.** *See* Kinsley, *Lucrative Lure of Torts,* Wash. Times, Nov. 6, 1985, at 1D, col. 6. Bills which would set caps on damages for product liability are now pending in Congress and many state legislatures. The American Medical Associa-

tion, because of vast damage verdicts returned by juries in malpractice actions, is currently advocating that such cases should be adjudicated, not by the courts, but by panels of experts.