DONNA FRAME, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ARIK FRAME, DECEASED, AND DONNA FRAME AND CHARLES FRAME, INDIVIDUALLY AND IN THEIR OWN RIGHT, PLAINTIFFS-APPELLANTS, v. DR. N. KOTHARI, M.D.; HEALTH CARE PLAN OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued September 26, 1988—Decided July 20, 1989.

*Gary D. Ginsberg* argued the cause for appellants (*Fried-man, Bafundo, Ginsberg & Porter,* attorneys).

*Richard A. Grossman* argued the cause for respondents (*Grossman & Kruttschnitt,* attorneys; *Barbara Ann Jacob,* on the brief).

The opinion of the Court was delivered by

POLLOCK, Justice.

The primary issue on this appeal is whether the parents of a child whose death is caused by medical misdiagnosis may maintain a claim against the negligent doctor for the infliction of their emotional distress. In the Law Division, the jury awarded the parents $10,000 for the wrongful death of the child and $500 each for their emotional distress. The Appellate Division affirmed the wrongful-death award and reversed the award for emotional distress. 218 *N.J.Super.* 537 (1987). We granted certification, 109 *N.J.* 45 (1988), and now affirm.

–I–

Sometime between 6:30 and 7:30 a.m. on January 22, 1982, ten-month-old Arik Frame fell down the thirteen-step stairway of his home. His parents, Charles and Donna Frame, immediately took him to a health clinic, defendant Health Care Plan of New Jersey (Health Care), where he was treated by one of its employees, defendant Dr. Nita Kothari, a board-certified pediatrician. Dr. Kothari gave Arik a complete examination and ascertained, among other things, that he had a fever of 102 degrees that started the day before and a soft spot at the back of his head. She diagnosed Arik as suffering from a virus, and told the Frames to awaken him every four hours to check for symptoms of a head injury. Plaintiffs disputed Dr. Kothari's testimony that she told them "to check for the pupils, I asked them to watch for vomiting."

On returning home, Mrs. Frame put Arik to bed. When Mr. and Mrs. Frame awakened him at 2:00 p.m., they became concerned and called Dr. Kothari. According to Dr. Kothari, Mr. Frame stated that the infant had vomited. Mr. and Mrs.

Frame testified that Mr. Frame told Dr. Kothari that Arik's eyes were "pivoting" or rolling in the eye sockets, testimony that Dr. Kothari contradicted.

Dr. Kothari advised the Frames to let Arik sleep for four more hours. When they tried to awaken him at 6:00 p.m., Arik was moribund. They immediately took him to Cooper Medical Center, where x-rays revealed a blood clot at the rear of his skull. Around midnight, emergency surgery was performed, and the Frames stayed at the hospital until 3:00 a.m. Two hours later, the hospital called to inform them that Arik had died. An autopsy disclosed that the cause of death was an intra-cerebellar hemorrhage due to a blunt trauma to the skull.

The sole basis for the emotional-distress claim was Dr. Kothari's alleged negligence in failing to tell the Frames in their 2:00 p.m. telephone conversation to bring Arik to Health Care after Mr. Frame told the doctor that Arik's eyes were pivoting. Mrs. Frame claimed that the shock of discovering her son in a moribund condition four hours later caused her to become severely depressed and to suffer from nightmares and insomnia. She consulted a psychiatrist, who diagnosed her condition as "a chronic post-traumatic stress disorder." He attributed her symptoms to a series of events beginning with Arik's fall downstairs, extending through the observation of the pivoting motion of his eyes, and ending with Arik's death. The psychiatrist was unable to separate one moment from the next in establishing the symptoms that caused Mrs. Frame's condition.

Mr. Frame testified that his personality changed following the death of Arik, that he became isolated from his family and friends, and that he continues to experience a deep sense of loss. The Frames separated approximately seven months after Arik's death. Mrs. Frame subsequently conceived a child by another man because, as she testified, "I thought that maybe I would feel better if I had another baby...." On January 3, 1984, she gave birth to a baby girl. By the time of trial, Mr. and Mrs. Frame were divorced.

In answer to special interrogatories, the jury, apparently accepting the Frames' version of the 2:00 p.m. telephone conversation, found that Dr. Kothari had failed to provide proper instructions to the Frames, and that her failure caused Arik's death.

–II–

Everyone is subject to injury, disease, and death. Common experience teaches that the injury or death of one member of a family often produces severe emotional distress in another family member. A threshold problem is separating the grief that attends that distress when no one is at fault from the added stress attributable to the fact that the injury or death was produced by the negligent act of another.

The history of claims for the negligent infliction of emotional distress is one of increasing recognition of psychic injury tempered by a concern for "speculative results or punitive liability." *Portee v. Jaffee,* 84 *N.J.* 88, 97 (1980); W.P. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on The Law of Torts* § 54 at 359–67 (5th ed. 1984) (Prosser & Keeton). Various constraints have provided an assurance of the genuineness of a claim for emotional distress and a limitation on liability. In this state, physical impact was once a prerequisite of a valid claim for the negligent infliction of emotional distress. *Ward v. West Jersey & Seashore R. Co.,* 65 *N.J.L.* 383 (Sup.Ct.1900). Since 1965, however, we have allowed recovery for emotional distress resulting in physical injury even in the absence of physical impact. *Falzone v. Busch,* 45 *N.J.* 559, 569 (1965). More recently, we have allowed recovery, even in the absence of physical injury, if the plaintiff observed an injury to another at the scene of an accident, the plaintiff and victim are members of the same family, and the emotional distress is severe. *Portee, supra,* 84 *N.J.* at 101.

In *Portee,* plaintiff's seven-year-old son was trapped between the door and shaft of an apartment-house elevator. Another

child discovered the boy and ran for help. Over a four-hour period, the mother observed rescue efforts, during which her son, who suffered multiple fractures and massive internal hemorrhaging, moaned, screamed in pain, and flailed his arms from his trapped position. While his mother watched, he died, still trapped. Thereafter she became severely depressed and attempted suicide. On these facts, we recognized the mother's claim for her emotional distress caused by the elevator company's failure to maintain the elevator in a safe condition. Although the plaintiff had not observed the negligent act or the initial impact on the victim, we allowed her claim because she had witnessed a shocking event. Liability was limited to the foreseeability of " 'shock severe enough to cause substantial injury in a person normally constituted, thus then bringing the plaintiff within the 'zone of risk.' ' " *Id.* at 94 (quoting *Caputzal v. Lindsay Co.*, 48 *N.J.* 69, 76 (1966)). A plaintiff could recover if he or she could prove "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 101 (drawing on *Dillon v. Legg*, 68 *Cal.*2d 728, 740, 441 *P.*2d 912, 920, 69 *Cal.Rptr.* 72, 80 (1968)).

 We limited recovery "to negligent conduct which strikes at the plaintiff's basic emotional security," *id.* at 99, recognizing that the discovery of

> the death or serious injury of an intimate family member will always be expected to threaten one's emotional welfare. Ordinarily, however, only a witness at the scene of the accident causing death or serious injury will suffer a traumatic sense of loss that may destroy his sense of security and cause severe emotional distress. [*Ibid.*]

To justify recovery, the plaintiff should observe the kind of result that is associated with the aftermath of an accident, such as bleeding, traumatic injury, and cries of pain. *Gates v. Richardson*, 719 *P.*2d 193, 199 (Wyo.1986). Recovery for the

negligent infliction of emotional distress is meant to cover the observation of shocking events that do not occur in the daily lives of most people. Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: "The Bystander Recovery" Cases,* 54 *S.Cal.L.Rev.* 847, 871 (1981). Merely being on the scene may not be enough. The injury must be one that is susceptible to immediate sensory perception, and the plaintiff must witness the victim when the injury is inflicted or immediately thereafter.

Consistent with that premise, a mother was permitted to proceed with her suit for her emotional distress when she discovered her eight-year-old son lying crumpled in the street minutes after he was struck by a bus. *Mercado v. Transport of New Jersey,* 176 *N.J.Super.* 234 (Law Div.1980). Similarly, a mother was allowed to recover when she observed the hyperalimentation or administration of fluids through a catheter inserted into her daughter's jugular vein, followed by the daughter's convulsions and death. *Polikoff v. Calabro,* 209 *N.J.Super.* 110 (App.Div. 1986). Likewise, parents were allowed to recover damages for emotional distress from a stillbirth caused by medical malpractice. In reaching that result, we explained that "the experience of pregnancy and child birth itself constitutes the immediacy and presence of the claimant in the face of inflicted personal injury or death of a loved one that was stressed in *Portee.*" *Giardina v. Bennett,* 111 *N.J.* 412, 419–20 (1988).

■ Our focus here is on the right of one family member to recover for the emotional distress caused by the medical misdiagnosis of another member of the family. A misdiagnosis may lead to tragic consequences that expose the negligent physician to claims for personal injuries or the wrongful death of the victim. By its nature, diagnosis is an intellectual undertaking, requiring the physician to analyze symptoms and reach a conclusion. The nature of a misdiagnosis is such that its results may neither manifest themselves immediately nor be shocking.

Hours, days, or months may separate a misdiagnosis, the manifestation of the injury to the patient, and the family member's observation of the injury. Thus, the event may not cause the simultaneous concurrence or rapid sequence of events associated with a shocking event. The observing family member will not be exposed to the harm of seeing a healthy victim one moment and a severely injured one the next. *See* Case Comment, *Dillon Revisited: Toward a Better Paradigm for Bystander Cases*, 43 *Ohio St.L.J.* 931, 946 (1982). Furthermore, the observed effect may not be so gruesome or horrifying as to justify the award of a claim for emotional distress to another member of the victim's family. Grief over the gradual deterioration of a loved one, as profound as that grief may be, often does not arise from a sudden injury. The observer has time to make an emotional adjustment. *See id.* at 944–46.

For example, when the doctor failed to diagnose an intestinal obstruction in a newborn boy, the mother was not allowed to recover for her emotional distress from the death of her son three days after birth. *Lindenmuth v. Alperin*, 197 *N.J.Super.* 385 (Law Div.1984). Although the stated reason for disallowing the mother's claim was that she observed a "result rather than an act," *id.* at 389, the decision may also be understood as denying recovery when the mother watched the deterioration of her child over a period of three days without appreciation of the impact of the doctor's act of malpractice. The facts of *Lindenmuth* do not demonstrate that the defendant's failure to diagnose, the manifestation of that failure, and the death of the infant were sufficiently connected to support a claim for emotional distress. The distress that Mrs. Lindenmuth doubtless suffered could be as readily attributed to her understandable grief over the loss of her baby as to her observation of the baby and her knowledge that the doctor had failed to diagnose the cause of death.

Decisions from other courts, although supported by a variety of rationales, are consistent with the proposition that one family member should not recover for emotional distress result-

ing from the misdiagnosis of another family member, at least in the absence of a close temporal connection between the misdiagnosis and the injury, as well as the contemporaneous observation of the injury by the family member. For example, the California Court of Appeals denied recovery to a wife when the doctor negligently failed to diagnose her husband's cancer, which was not properly diagnosed until two years later when it had become terminal. *Budavari v. Barry*, 176 *Cal.App.*3d 849, 222 *Cal.Rptr.* 446 (1986). In denying recovery, the court stated that the "failure to detect cancer or to follow up on the X–ray findings was not an 'event' which could be witnessed." *Id.* at 853, 222 *Cal.Rptr.* at 448. In another case, the same court denied recovery to a mother who took her five-year-old daughter to the defendant hospital where the mother observed her daughter's progressive decline and death because of the hospital's alleged failure to diagnose a massive gastrointestinal hemorrhage due to a penetrating duodenal ulcer. Noting that the precipitating event was neither sudden nor "one which can be the subject of sensory perception," the court rejected "visibility of the result, as distinguished from that of the tortious act itself, [as] the essential element." *Jansen v. Children's Hosp. Medical Center of East Bay*, 31 *Cal.App.*3d 22, 24, 106 *Cal.Rptr.* 883, 885 (1973).

The Connecticut Supreme Court denied recovery for a mother's emotional distress arising from the failure of physicians to diagnose and treat her daughter's respiratory problems. *Amodio v. Cunningham*, 182 *Conn.* 80, 438 *A.*2d 6 (1980). On the day following the doctor's misdiagnosis, the daughter began gasping, and the mother administered mouth-to-mouth resuscitation. Two days later, following the discontinuance of extraordinary life-support methods, the daughter died. The court wrote: "[t]he allegations of the complaint indicate that the injuries suffered by the plaintiff's child became manifest a considerable period of time after the alleged negligence of the defendants occurred." *Id.* at 93, 438 *A.*2d at 12.

Likewise, the Michigan Court of Appeals has denied recovery when the doctor failed to diagnose pneumonia in plaintiff's sister. *Pate v. Children's Hosp. of Michigan,* 158 *Mich.App.* 120, 404 *N.W.*2d 632 (1986). Two days later the sister died in the hospital emergency room while in plaintiff's arms. The court wrote:

> What is missing from these allegations is the contemporaneous infliction of a tortious injury that could be described as an inherently shocking event. All that the plaintiff has alleged are negligent omissions in the form of nonobservable events that occurred two days prior to the decedent's death. [*Id.* at 124, 404 *N.W.*2d at 633.]

Last year the District of Columbia Court of Appeals reached a similar result in denying a mother's claim for emotional distress arising from the misdiagnosis as a virus of her young son's acute epiglottitis, an inflammation of the epiglottis that prevents swallowing. As a result, the son lost consciousness and was rushed to the hospital where he spent thirteen days, three of them in an intensive-care unit. In its original opinion, the court denied recovery. *Williams v. Baker,* 540 *A.*2d 449 (1988). Subsequently, however, the court vacated the opinion and granted an *en banc* hearing, the outcome of which remains undetermined. *Ibid.*

Finally, the New Mexico Court of Appeals denied recovery to parents for the emotional distress they suffered from the failure of doctors over an eight-day period to diagnose that their newborn son was suffering from bilirubin encephalopathy (the accumulation in the brain of the orange-colored or yellowish pigment in bile). As a result, the child suffered brain damage. *Wilson v. Galt,* 100 *N.M.* 227, 668 *P.*2d 1104, *cert. quashed,* 100 *N.M.* 192, 668 *P.*2d 308 (1983). The court wrote that the "complaint indicat[ed] no observance by either parent of a sudden trauma involving [the child]. The allegations suggest a gradual occurrence of harm, and awareness by the parents of the deterioration but not of the cause." *Id.* at 233, 668 *P.*2d at 1110.

Although variously expressed, the common thread running through these cases is that a misdiagnosis normally does not

create the kind of horrifying scene that is a prerequisite for recovery. Rarely will a member of the patient's family contemporaneously observe the immediate consequences of the defendant's misdiagnosis, and even more rarely will the results of the misdiagnosis be the injury or death of a loved one contemplated by the gruesome scene portrayed in *Portee*.

Occasionally a case will present such aggravated facts that recovery is justified. In *Ochoa v. Superior Court*, 39 *Cal.*3d 159, 703 *P.*2d 1, 216 *Cal.Rptr.* 661 (1985), the California Supreme Court allowed a mother to recover for emotional distress, finding both that she observed the doctor's misdiagnosis and that she was contemporaneously aware that the misdiagnosis was causing harm to her son. Mrs. Ochoa's son was admitted to the custody of the county juvenile hall. A month later he apparently became ill with a cold and sought treatment at the infirmary, where he was diagnosed as suffering from the flu. When Mrs. Ochoa visited her son, he was pale and dehydrated. Throughout her visit, he went into convulsions, hallucinated, vomited, coughed up blood, and complained of great pain. Plaintiff importuned the defendant doctor for permission to take her son to the family physician, but the doctor denied her request, telling her to return the following morning to discuss the matter with the probation officer. When her son complained of pain under his left rib cage, plaintiff repeated in vain her request that he "be released to her private doctor 'even if handcuffed.'" *Id.* at 163, 703 *P.*2d at 3, 216 *Cal.Rptr.* at 663. Notwithstanding orders that she leave, Mrs. Ochoa remained at her son's side, applying cold compresses for his fever and watching him writhe and cry out in pain. When the authorities again ordered her to leave, she kissed him, made a final and unsuccessful plea to take him to the family physician, and, in emotional turmoil, left. At one o'clock the following morning, her son died. The California Supreme Court allowed the mother's claim for emotional distress, but distinguished the claim of the father, who was not present during her visit.

The court ruled that "when there. is observation of the defendant's conduct and the child's injury and contemporaneous awareness the defendant's conduct or lack thereof is causing harm to the child, recovery is permitted." *Id.* at 170, 703 *P.*2d at 8, 216 *Cal.Rptr.* at 668. In distinguishing the mother's case from that of the father, the court stated

> that a distinction between distress caused by personal observation of the injury and by hearing of the tragedy from another is justified because compensation should be limited to abnormal life experiences which cause emotional distress. While receiving news that a loved one has been injured or has died may cause emotional distress, it is the type of experience for which in a general way one is prepared, an experience which is common. By contrast few persons are forced to witness the death or injury of a loved one or to suddenly come upon the scene without warning in situations where tortious conduct is involved. In the present case, for example, while it is common to visit a loved one in a hospital and to be distressed by the loved one's pain and suffering, it is highly uncommon to witness the apparent neglect of the patient's immediate medical needs by medical personnel. [*Id.* at 165 n. 6, 703 *P.*2d at 5 n. 6, 216 *Cal.Rptr.* at 665 n. 6.]

We agree.

■ In an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress. Such an event could be shocking.

In reaching that conclusion, we recognize that the evaluation of a family member's claim for emotional distress involves drawing lines. Whenever a court draws lines, it risks the criticism of arbitrariness. Drawing lines, however, is the business of the courts, and lines must be drawn to provide remedies for wrongs without exposing wrongdoers to unlimited liability. Our task is to draw the boundary of a claim that permits recovery for the added stress caused by medical misdiagnosis without unreasonably burdening the practice of medicine. *See* Prosser & Keeton, *supra,* § 54 at 366.

In acknowledging the possibility of a claim for emotional distress, we are sensitive to the concerns of the concurring

opinion about the effect of such a claim on the economics of the medical profession. The claim that we recognize, however, is narrowly circumscribed. In the present case, no showing has been made that it would have an adverse effect on the practice of medicine or on the availability of medical services. We believe that any added cost to the medical profession from the recognition of such a claim is outweighed by the suffering of severe emotional distress from the shock of observing a misdiagnosis that results in immediate injury to a loved one. Although doctors should not be obligated to pay merely because something goes wrong, they should not be excused from compensating those who are injured by proven acts of malpractice.

–III–

Here, Mr. and Mrs. Frame were present during the 2:00 p.m. telephone conversation when Dr. Kothari negligently failed to diagnose their son's condition. The diagnosis, however, did not manifest itself in an immediate injury. It was not until four hours later that Mr. and Mrs. Frame discovered their son in a moribund condition. Eleven more hours elapsed before they learned through a telephone call from the hospital of his death. The chain of circumstances, although deeply tragic, were not "shocking." In a sense, their situation was like that of parents who witnessed the pain and suffering of their child due to illness or injury without awareness that a medical misdiagnosis was contributing to their child's continued pain and suffering. *See Ochoa, supra,* 39 *Cal.*3d at 170, 703 *P.*2d at 8, 216 *Cal. Rptr.* at 668.

With respect to the $10,000 wrongful-death award, we agree with the Appellate Division that the verdict does not demonstrate a "pervading sense of wrongness such as would cause us to be clearly convinced that the verdict is terribly wrong." 218 *N.J.Super.* at 542.

The judgment of the Appellate Division is affirmed.

WILENTZ, Chief Justice, and GARIBALDI, Justice, concurring.

We agree with the majority's decision to distinguish this case from *Portee v. Jaffee*, 84 *N.J.* 88 (1980). We would, however, await "an appropriate case" before deciding whether the common-law remedy for death or serious injury caused by medical malpractice should be extended to the consequent emotional distress of family members, including situations in which family members are contemporaneously aware that the misdiagnosis is causing injury to their loved one.

"The torts process, like the law itself, is a human institution designed to accomplish certain social objectives." *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 254 (1985). Courts have always shaped the law of negligence to further societal interests in curtailing or encouraging certain types of behavior. *Id.* at 254–55; *see* Henderson, *Expanding the Negligence Concept: Retreat From the Rule of Law*, 51 *Ind.L.J.* 467, 482 (1976).

Expanding liability should entail the balancing of many interests: "a weighing of the relationships of the parties, the nature of the risk, and the public interest in the proposed solution." *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583 (1962); *see also* B. Cardozo, *The Paradoxes of Legal Science* (1928), *reprinted in Selected Writings of Benjamin Nathan Cardozo* 251, 300 (M. Hall ed. 1947) [hereinafter *Cardozo* ] (changes in the law must be preceded "by a balancing of social interests, and estimate of social values.") These societal interests must be protected through continual re-evaluation.

We suspect that the cost to society of expanding medical malpractice liability to allow a family member to recover for his or her emotional distress as a result of a physician's improper diagnosis will outweigh the benefits to society. Possible costs to society include the increasing number of physicians who

refuse to practice in certain fields,[1] the cost, in all fields, of an increase in "defensive medicine,"[2] and the increasing cost of medical treatment itself.[3] The loss is the failure to compensate for the suffering of family members arising from the death or serious injury of a loved one caused by medical malpractice. We do not believe that the majority achieves any additional deterrence given the present state of medical malpractice liability.[4]

A doctor who breaches a duty owed *directly* to a patient must compensate the patient for his or her injuries. Likewise, if a doctor commits malpractice that results in the patient's death, the family members may recover for their loss of the loved one in a wrongful-death action. Moreover, we recognize

---

[1]According to a recent *New York Times* article, a study by the New York chapter of the American College of Obstetricians and Gynecologists revealed that "nearly 10 percent of the state's approximately 2,000 obstetricians are abandoning baby delivery each year." French, *New York Obstetricians Report a Crisis, N.Y. Times,* Oct. 6, 1988, at Bl, col. 2.

[2]Zuckerman, Koller, Bovbjerg, *Information on Malpractice: A Review of Empirical Research on Major Policy Issues,* 49 Law and Contemporary Problems 85, 108–109 (1986); *Defensive Medicine and Medical Malpractice: Hearing Before the Senate Comm. on Labor and Human Resources,* 98th Cong., 2d Sess. 167 (1984) [hereinafter *Hearing*] (statement of Elroy Raines, Assoc. Director, Department of Professional Liability, the American College of Obstetricians and Gynecologists) (survey of gynecologists revealed "that 76% had substantially increased testing and other diagnostic procedures."); *Hearing, supra,* at 155 (statement of James E. Davis, M.D., Speaker of the House of Delegates, American Medical Association) (citing projected costs of defensive medicine at $15.1 billion).

[3]*See* Ingber, *Rethinking Intangible Injuries: A Focus on Remedy,* 73 *Cal.L. Rev.* 772, 790 (1985); Bell, *Legislative Intrusions Into the Common Law of Medical Malpractice: Thoughts About the Deterrent Effect of Tort Liability,* 35 *Syracuse L.Rev.* 939, 957–59 (1984) (citing study that doctors pass on to patients more than 100% of their premium increases).

[4]Miller, *The Scope of Liability for Negligence Infliction of Emotional Distress: Making the Punishment Fit the Crime,* 1 *U.Hawaii L.Rev.* 1, 25 (1979); Bell, *supra,* note 3, at 965–70 (citing studies that found doctors already alter their behavior in response to the threat of liability).

a duty owed directly to the parents when a doctor commits malpractice that causes a fetus to be stillborn, *Giardina v. Bennett*, 111 *N.J.* 412, 428–29 (1988).

We acknowledge that the trend of the prior decisions in the area of bystander emotional distress has been to expand liability. It is not, however, the trend, but the social policy underlying it, that should guide the development of the common law. *See Cardozo, supra,* at 284.

While we suspect that society will not be served by allowing this type of recovery, we cannot make that final decision based on the record in this case. The case was not argued on that ground. Accordingly, we need not, and should not, decide it. Indeed, precisely because it is such an important issue, the Court should withhold judgment. We therefore do not join the majority's holding in respect of a situation not before us.

WILENTZ, C.J., and GARIBALDI, J., concurring in the result.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—5.