209 N.J. Super. 110 (1986)
506 A.2d 1285
BRAHAM POLIKOFF, ET AL., PLAINTIFFS-APPELLANTS,
v.
JOHN CALABRO, M.D., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1986.
Decided March 21, 1986.
Before Judges PRESSLER, DREIER and BILDER.
*111 Lewis Stein argued the cause for appellants (Nusbaum, Stein, Goldstein & Bronstein, attorneys; Lewis Stein, on the brief).
Craig S. Combs argued the cause for respondents (Giblin, Combs & Cooney, attorneys; Craig S. Combs, of counsel; Jill E. Haley, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The question raised by this appeal, taken on leave granted, is whether the cause of action for negligent infliction of emotional distress recognized by Portee v. Jaffee, 84 N.J. 88 (1980), is available to a parent who watches her child die as the result of medical malpractice. We are satisfied that the singular facts of this case satisfy the elements of the cause of action as defined by Portee. We therefore reverse the trial court's partial summary judgment striking the count of the complaint seeking recovery for mental anguish.
Audrey Rae Polikoff, the then six-year-old daughter of plaintiffs Braham and Jacqueline Polikoff, was admitted to Overlook Hospital on August 10, 1982 for surgery to relieve a duodenal obstruction. Her surgeon, defendant Joseph Panzarino, was not satisfied with her postoperative course and recommended a second operation "to revise the duodenojejunostomy." He performed that operation on August 24, 1982. The anesthesiologist was defendant John Calabro. During the surgery, Calabro inserted a central venous pressure catheter into the child's right internal jugular vein. The purpose of the insertion was two-fold: first, for monitoring and, second, for hyperalimentation, should that procedure later have been deemed necessary by the surgeon.[1] Panzarino described the child's immediate *112 postoperative course in his medical record note as "benign" and she appeared to be recovering. From the time she returned to her hospital room from the postoperative recovery room, one or both of her parents was with her at all times.
During the morning of August 26, a day and a half after the operation, her father was with her and observed that "she was doing very well. I believe she painted a kite. * * *" The nurses' record indicated that Audrey and her father were playing cards at 11:45 a.m. Around noontime Mrs. Polikoff arrived at the hospital and her husband left. Some time during the afternoon, while Mrs. Polikoff was with Audrey, the hyperalimentation was started. Audrey died two hours later. According to Panzarino's note in the hospital record, "the child died of a cardiac tamponade[2] secondary to perforation of the central venous pressure catheter into the pericardial sac."
During the two hours between the start of the hyperalimentation and the child's death, Mrs. Polikoff was at her daughter's bedside until, towards the end and during the final unsuccessful resuscitation efforts, she and her husband were told that they had to leave the room. Dr. Polikoff had returned to the hospital during that two-hour period in response to Mrs. Polikoff's telephone call to him which she made when she realized the child was in serious distress. No blood pressure could be ascertained, and Audrey was having serious difficulty breathing. Various teams of nurses, residents and physicians worked on her until the resuscitation team was finally summoned, to no avail. Mrs. Polikoff suffered severe emotional trauma as a result of the death of the child and was in active psychiatric treatment for some time thereafter.
*113 Dr. Polikoff, as general administrator and administrator ad prosequendum of Audrey's estate, then commenced this action against Dr. Calabro and Dr. Panzarino. The first and second counts of the complaint assert a survival and a wrongful death cause of action, respectively. In the third count, Mrs. Polikoff sought recovery for her emotional distress. The factual theory of the liability claim is that defendants deviated from acceptable medical standards when they permitted the hyperalimentation drip to begin without first checking, by x-ray, the position of the catheter, whose misplacement, they contend, permitted the accumulation of the hyperalimentation fluid in the pericardium, causing the cardiac tamponade which resulted in Audrey's death.
Defendant Calabro moved for partial summary judgment dismissing the third count of the complaint contending that Mrs. Polikoff's involvement with her daughter's death did not satisfy all the elements of the cause of action, which are defined by Portee, supra, 84 N.J. at 101, as:
(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress.
It is the third of these elements, the observation of the death or injury at the scene of the accident, which is in issue here. The trial judge agreed with defendant's contention that there had been no such required observation. We disagree.
The cause of action based on negligent infliction of emotional distress, as recognized by Portee, represents an accommodation, as a matter of public policy, between two competing considerations: avoidance of unfettered imposition of liability on tortfeasors for the mental anguish suffered by loved ones, on the one hand, and, on the other, the appreciation that that anguish is real, consequential and foreseeable. The basis of the accommodation is the perception that observation of the occurrence of the negligently inflicted injury or death results in a wrench to the psyche of the victim's loved ones separate from *114 and dramatically more excruciating than the anguish attendant upon later learning of the event or seeing its consequences. See generally Prosser & Keeton, Torts (5th ed. 1984) § 54 at 365-367. It is not, of course, for us to criticize the bystander element of the cause of action as defined by Portee, but only to apply it.[3]
In concluding that the bystander element was absent here, the trial judge relied on Lindenmuth v. Alperin, 197 N.J. Super. 385 (Law Div. 1984), in which the parents of an infant who died three days after birth as the result of an allegedly negligent failure to diagnose and treat an intestinal obstruction sought emotional injury damages. The court there concluded that the misdiagnosis, which led to the death of the child from the condition misdiagnosed, did not constitute an observed injury within the intendment of the bystander rule.
Without commenting on the correctness of the Lindenmuth rationale, we are nevertheless satisfied that it is here inapplicable. According to plaintiffs' theory of the malpractice action, their child did not die as a result of the disease or condition for which she was being treated but rather her death was directly caused by an improperly conducted, physically intrusive medical *115 procedure. Moreover, injury to the child resulted not from the allegedly negligent insertion of the catheter while she was on the operating room table, but from the introduction of hyperalimentation fluid into the incorrectly positioned catheter. Mrs. Polikoff observed the infliction of that injury, and she observed her child through all of the consequential stages of that injury concluding with the fatal cardiac tamponade. These facts are sufficient to satisfy the bystander rule. See Ochoa v. Superior Court (Santa Clara County), 39 Cal.3d 159, 216 Cal. Rptr. 661, 703 P.2d 1 (1985); Mobaldi v. Regents of University of California, 55 Cal. App.3d 573, 127 Cal. Rptr. 720 (Cal. App. 1976). Since, for purposes of ruling on the summary judgment motion, all of the other elements were established, the cause of action based on emotional distress should have been permitted to proceed.
NOTES
[1] Hyperalimentation is defined by Stedman's Medical Dictionary 598 (Third Unabridged Lawyers' Edition, 1972) as: "administration of fluids containing essential nutrients through a venous catheter positioned in the superior vena cava; therapy is continuous and permits total replacement of nutritional needs at a slow rate, which minimizes overloading and excessive renal losses."
[2] Cardiac tamponade is defined by Stedman's, supra at 1253, as: "compression of the heart resulting from accumulation of fluid within the pericardial sac." The hospital record here described the fluid which had accumulated as the hyperalimentation fluid introduced through the catheter.
[3] We point out that the required contemporaneous sensual perception has been recognized as arbitrary even by the courts which have incorporated it as an element of the cause of action. It is also recognized that no other aspect of the tort as so defined has resulted in more attention and litigation. See, e.g., James v. Lieb, 221 Neb. 47, 375 N.W.2d 109, 114-115 (1985). See also cases collected in Annotation, "Immediacy of Observation of Injury as Affecting Right to Recover Damages for Shock or Mental Anguish From Witnessing Injury to Another," 5 A.L.R. 4th 833 (1981 & Supp. 1985). See also Ferriter v. Daniel O'Connell's Sons, Inc., 381 Mass. 507, 413 N.E.2d 690, 697 (1980), in which the Supreme Judicial Court noted:

A plaintiff who rushes onto the accident scene and finds a loved one injured has no greater entitlement to compensation for that shock than a plaintiff who rushes instead to the hospital. So long as the shock follows closely on the heels of the accident, the two types of injury are equally foreseeable.
But see Bischoff v. Kohlrenken, 185 N.J. Super. 548 (Law Div. 1982) (rejecting parents' cause of action based on their presence at a hospital where their son was taken immediately after a traffic accident and died several hours later, after the parents' arrival).