269 N.J. Super. 599 (1994)
636 A.2d 113
JEAN GENDEK, ADMINISTRATOR AD LITEM OF THE ESTATE OF GREGORY GENDEK AND JEAN GENDEK AND STANLEY GENDEK, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
ESTRELLA POBLETE, C. GRAUER RAQUEL ABARY, ANTHONY BIRCHMAN, MERCER MEDICAL CENTER, MARY ANN FARLEY, P. PHILLIP, D. JOHNSON, JEAN MAGAULLIRI, TRACY GERGEL, THE ABC CORPORATION AND JOHN DOES I THROUGH V AND JANE DOES I THROUGH V, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1993.
Decided January 21, 1994.
*600 Before Judges SHEBELL, LONG and LANDAU.
Edward B. Meredith argued the cause for appellants (Meredith, Meredith & Chase, attorneys).
Stacy L. Moore, Jr. argued the cause for respondents Mercer Medical Center, Caroline Pat Phillips, Diane Johnson, Jean Magaulliri and Tracy Gergel (Parker, McCay & Criscuolo, attorneys).
Jeanne A. Taylor argued the cause for respondent Mary Ann Farley (Grehan).
The opinion of this court was delivered by LONG, J.A.D.
On June 19, 1989, Plaintiffs, Jean and Stanley Gendek, filed a complaint in their individual capacities and as administrators ad litem of the Estate of Gregory Gendek against Estrella Poblete, an obstetrician; C. Grauer, a resident or mid-wife; Raquel Abary, a pediatrician; Anthony Birchman, a pediatrician; Mercer Medical Center; Mary Anne Farley, P. Phillips, D. Johnson, Jean Magaulliri; Tracy Gergel and other nurses employed by Mercer Medical Center.[1]
The complaint claimed medical and nursing malpractice (Count I), administrative negligence (Count II), and negligent infliction of *601 emotional distress (Count III) arising out of the birth and subsequent death of Gregory Gendek. Defendant answered the complaint and in December 1992, Mercer Medical Center filed a motion for partial summary judgment seeking dismissal of Count III. Plaintiffs opposed the motion which was granted by Judge Yaskin. Plaintiffs moved for leave to appeal which we denied in April 1993 "without prejudice to plaintiff making an application to the Law Division for reconsideration in light of the recent Supreme Court decision in Carey v. Lovett,[2] decided April 6, 1993." Plaintiffs moved for reconsideration. Judge Yaskin reaffirmed the dismissal of the claim for emotional distress. Plaintiffs again moved for leave to appeal which we granted.

I
Gregory Gendek was born on September 27, 1987 at Mercer Medical Center. Shortly after the birth, Gregory was admitted to the Newborn Nursery. At that time it was noted that he had a hematoma on the left side of the forehead. Between 10:00 a.m. and noon, Gregory had three episodes of duskiness (blue-grey coloring), but he returned to normal upon stimulation and suction. Hospital records contain a notation that at 1:35, no suck reflex appeared. Despite the observation and recording of color change and absence of suck reflex, no nurse ever contacted the staff neonatologist, although a neonatologist is on duty in the hospital twenty-four hours a day. Neither of Gregory's parents, the plaintiffs, were aware of Gregory's color changes in the nursery until after Gregory's health turned worse the following day.
Gregory spent his first day of life with his mother, Jean Gendek and father, Stanley Gendek in his mother's hospital room. The infant appeared well and strong to his parents. Hospital records note that Mrs. Gendek was caring for her baby at 2:00 p.m. At 4:00 p.m., the records note that Mrs. Gendek was holding and cuddling the baby and that Mr. Gendek and other visitors were in *602 the room with them. At this point Mrs. Gendek's mother-in-law commented that the baby's hands and feet were purple. Mrs. Gendek pointed this out to an unidentified nurse who told her the baby was fine and that he just needed to be covered up with two blankets. The nurse wrapped up the baby and returned him to Mrs. Gendek. Mrs. Gendek did not notice any other incident of discoloration. Mrs. Gendek never noticed any discoloration around the baby's face. The infant stayed with Mrs. Gendek at least until 8:00 p.m. and possibly until 10:00 p.m.
On the morning of September 28, Mrs. Gendek woke up around 6:00. She walked down to the hospital nursery to see Gregory who appeared to be fine. He was on his stomach with a blanket on his back, covered up to his neck. He was wearing a little hat.
Mrs. Gendek returned to her room and ordered breakfast. Back in the nursery, Tracy Gergel, a nurse and co-defendant, discovered Gregory Gendek unresponsive in his bed at 8:00 a.m. She called co-defendant Jean Magaulliri, R.N., and started to give the infant oxygen. Nurse Magaulliri started CPR. The baby was transferred to the High Risk nursery and a code was called. Frothing of curdled milk from the baby's mouth was noted. Gregory's chart from the hospital reads:
Baby on abdomen  face turned slightly to side. Turned baby over, no respiration or chest movement noted. Skin color mottled and cold to touch. Muscle tone floppy. Stimulated baby with no response and called for help.... They immediately began respirations with an ambubag and mask at 100% 0. Marie Shickler, lead nurse SNC arrived and began cardiac compressions ... Baby transported to SCN in crib. CPR maintained continuously.
Thereafter, one or two nurses rushed into Mrs. Gendek's room and told her there was a problem with Gregory. Mrs. Gendek went with the nurses to the nursery, a distance of about thirty feet from her room. Mrs. Gendek saw about five or six people working over her baby, including a minister, although she did not know he was a minister at the time.
Mrs. Gendek witnessed the people surrounding her baby pumping on his chest and wheeling in IV bottles. One nurse directed Mrs. Gendek to call her husband and asked her if she had a family *603 priest. Mrs. Gendek went to the desk and called Mr. Gendek and told him the baby was not breathing and that he should rush to the hospital. Someone came out of the nursery and told Mrs. Gendek that the baby was breathing. Mr. Gendek arrived very shortly thereafter. The nurse who told Mrs. Gendek the baby was breathing again also told her that nothing was wrong and that the baby was fine.
The baby was later hooked up to a respirator and Mrs. and Mr. Gendek spoke with Dr. Mintz, a neonatologist. The doctor explained that the baby had turned blue and what had been done to revive him. The Gendeks spoke with nurses as well. Other meetings with doctors followed during which the Gendeks learned that their son had a problem with his brain.
The Gendeks stayed in the hospital with Gregory the first few weeks. They saw their son hooked up to tubes. They witnessed physical examinations and tests including ice water in his ears, fingers down his throat, poking of his eyes, and other procedures. When Gregory's condition changed and his lungs collapsed, the staff discontinued his therapy and his parents witnessed the curling up of his hands and feet. The Gendeks were advised they would have to prepare for long term therapy for Gregory. He was sent to Robert Wood Johnson Medical Center in New Brunswick for placement of tubes for nourishment and oxygen and then returned to Mercer Medical Center. The Gendeks spent the six and one half weeks trying to care for Gregory and ultimately had to make a decision about having the tubes removed. After that decision was made, Gregory died.

II
Two lines of cases have permitted recovery for negligent infliction of emotional distress in a familial setting. The first recognizes a direct claim for injury based upon negligence by the defendant addressed to the plaintiff. Examples include "wrongful birth" where parents can recover for the emotional distress caused by the negligent failure of physicians to advise the mother of the *604 availability of amniocentesis, thus depriving her of the right to choose to abort, Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979); a right to recover for emotional distress when medical malpractice results in a stillborn child, Giardina v. Bennett, 111 N.J. 412, 545 A.2d 139 (1988); and the right of parents to recover for emotional distress when a hospital fails to release their son's brain-dead corpse. Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523, 538 A.2d 346 (1988). These are essentially ordinary negligence cases governed by negligence concepts of breach of duty, causation and damages.
The second line of cases is quite distinct and recognizes a cause of action for damages suffered by a bystander as a witness to the injury of a third person. The seminal bystander case is Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980), in which a mother claimed emotional distress arising out of her observations of the suffering and death of her child who was mortally injured in an elevator accident due to defendant's negligence. Portee set forth the four elements of such a claim: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. Id. at 101, 417 A.2d 521.
When defendants moved for partial summary judgment in this case, Judge Yaskin dismissed the emotional distress count of the complaint, basing her decision upon Portee as refined in the medical malpractice context in Frame v. Kothari, 115 N.J. 638, 560 A.2d 675 (1989). In Frame, which arose out of physician's misdiagnosis, the Court held that in order to recover bystander emotional distress damages, a family member must witness the malpractice; observe the effects of the malpractice on the patient; immediately connect the malpractice with the injury and suffer severe emotional distress. 116 N.J. at 649, 560 A.2d 675. Judge Yaskin concluded that one element of Frame was absent here; the *605 Gendeks failed to contemporaneously observe malpractice which they connected to Gregory's injury.
Subsequent to this decision, the Supreme Court issued its opinion in Carey v. Lovett, 132 N.J. 44, 622 A.2d 1279 (1993), the facts of which are instructive. There, a physician had mistakenly advised plaintiffs, the Careys, that the twenty-six week old fetus Mrs. Carey was carrying was dead. She later gave birth to a living child although no one in the delivery room knew it. When the father insisted on an examination of the baby to determine the cause of death, the hospital staff realized that the baby was alive and rushed her to the neonatal unit. Several days later, the doctors found that the baby was hemorrhaging from both sides of her brain and about a week later, the parents decided to disconnect her from life-support machines after her doctors determined that she was profoundly damaged and in a vegetative state. Id. at 51-54, 622 A.2d 1279. The Supreme Court held that Mrs. Carey was not required to meet the bystander requirements in order to sustain her emotional distress claim:
Our analysis begins by recognizing that the physical and emotional ties between mother and fetus so unite them that a physician should anticipate that any malpractice that adversely affects the fetus will cause emotional distress to the mother. Unlike parents who have time to adjust between an act of malpractice on their child and a resultant injury, the expectant mother's distress is immediate. In effect, the connection between a mother and her baby so merges "direct" and "indirect" claims that the distinction disappears.
The unique relationship between a pregnant woman and her baby mitigates the need for the additional requirements of an "indirect claim" for emotional distress. Bound by physical and emotional ties, mother and baby are so closely joined that we need not require that the mother be "shocked" by malpractice on the baby. The maternal-fetal relationship bespeaks the genuineness of an otherwise-valid claim for emotional distress. To the extent that lack of preparation for the birth of a live, but impaired, child is relevant, it is subsumed in the requirement that the emotional distress be severe. That requirement provides a sufficient guaranty of genuineness to substitute for physical injury to the claimant, which until now has been an element of a direct claim for emotional distress. See Strachan, supra, 109 N.J. at 538, 538 A.2d 346.

[Carey, 132 N.J. at 59-60, 622 A.2d 1279.]
In essence, Carey determined that a maternal claim for emotional distress based upon malpractice to her fetus is a direct and not a *606 derivative claim, thus eliminating the need for the mother to meet the stringent reliability standards established in Portee and Frame. However, Carey reaffirmed the overall viability of Portee and Frame in a bystander situation and specifically declared the applicability of Frame to Mr. Carey's claim.
In moving for reconsideration in this case, plaintiffs argued their claim falls directly within Carey, thus obviating the need for Mrs. Gendek to have contemporaneously observed the malpractice and connected it to Gregory's injury. Judge Yaskin disagreed, declaring that the underpinning of Carey was the intimate relationship of mother and fetus which is absent after the delivery, and that emotional distress caused by malpractice upon a living infant is subject to the rigors of Frame v. Kothari. We agree and affirm.
The distinction between direct and bystander emotional distress claims is well-established in our jurisprudence. A bystander case based upon medical malpractice must meet the stringent reliability standards enunciated in Portee and Frame and affirmed in Carey. Carey broke new ground by its ruling that a mother's claim of emotional distress based upon malpractice to her fetus is a direct and not a derivative (bystander) claim. This ruling was based upon the essential identity of mother and fetus, i.e., the commission of malpractice on one was the commission of malpractice on the other. 132 N.J. at 59, 622 A.2d 1279. Here, plaintiffs seek to extend Carey to a claim of emotional distress to a mother arising out of malpractice to a newborn. To be sure, the commission of malpractice upon a minutes or hours-old infant is temporally close to a Carey situation. It is nevertheless fundamentally different in concept. Carey drew a line between emotional distress claims based on pre-birth malpractice and those arising after birth based upon the physical unity between mother and fetus. Birth rends that legal oneness and, while powerful arguments can be made that psychological identity continues past the moment of delivery, this Court is not at liberty to extend or otherwise modify the line drawn by the Supreme Court. By *607 declaring pre-birth malpractice on a fetus the basis for a direct emotional distress claim by the mother, the Supreme Court implicitly affirmed that post-delivery claims are subject to the Frame requirement of contemporaneous observation of the malpractice which is immediately connected to the child's injury. In the absence of such an allegation, plaintiff's claim for emotional distress was properly dismissed in this case.
Affirmed.
NOTES
[1] Also named were the ABC Corp., a fictitious designation for the facility used by defendants Abary and/or Birchman as an answering service, and various John and Jane Does who were alleged to be nurses, administrative and medical personnel of Mercer Medical Center.
[2] 132 N.J. 44, 622 A.2d 1279 (1993).