654 A.2d 970

JEAN GENDEK, ADMINISTRATOR AD LITEM OF THE ESTATE OF GREGORY GENDEK AND JEAN GENDEK AND STANLEY GENDEK, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. ESTRELLA POBLETE, C. GRAUER, RAQUEL ABARY, ANTHONY BRICKMAN, THE ABC CORPORATION AND JOHN DOES I THROUGH V AND JANE DOES I THROUGH V, DEFENDANTS, AND MERCER MEDICAL CENTER, MARY ANN FARLEY (GREHAN), P. PHILLIP, D. JOHNSON, JEAN MAGAULLIRI, AND TRACY GERGEL, DEFENDANTS–RESPONDENTS.

Argued November 7, 1994—Decided March 15, 1995.

*Edward B. Meredith* argued the cause for appellants (*Meredith, Meredith & Chase,* attorneys).

*Stacy L. Moore, Jr.,* argued the cause for respondents Mercer Medical Center, P. Phillip, D. Johnson, Jean Magaulliri and Tracy Gergel (*Parker, McCay & Criscuolo,* attorneys).

*Jeanne A. Taylor,* argued the cause for respondent Mary Ann Farley (Grehan).

The opinion of the Court was delivered by

HANDLER, J.

This case involves the claim of parents for negligent infliction of emotional distress arising out of the death of their infant son. The baby was born in apparent good health, but subsequently developed profound respiratory problems during a standard post-

birth incubatory period. As a result of the respiratory problems, the baby stopped breathing. Although medical personnel were able to resuscitate the infant, he suffered severe brain damage as a result of the loss of oxygen to the brain. The parents eventually decided to remove life-support machines from the forty-five day old infant, who then died.

The parents filed a complaint in their individual capacities and as administrators *ad litem*, in which they alleged medical and nursing malpractice, administrative negligence, and negligent infliction of emotional distress attributable to the death of their child. We consider this case on the parents' motion for leave to appeal the lower courts' dismissal of their claim for negligent infliction of emotional distress.

The Court must decide whether parents who apparently were unaware of and did not witness any professional malpractice that resulted in their child's eventual death may recover for the emotional distress they suffered in observing the initial frantic but ultimately futile efforts to save their child's life.

I

Jean Gendek gave birth to a baby boy by normal vaginal birth at 7:28 a.m. on September 27, 1987. The boy, later named Gregory, appeared healthy at birth.

In accordance with standard procedure, Gregory was transferred to the Neonatal Nursery after birth. The nurse on duty at the Nursery noted that Gregory had a hematoma on the left side of his forehead and appeared slightly dusky. The nurse also noted that Gregory's color returned to normal after stimulation. A noontime notation reflects that Gregory was reported dusky three times between birth and 12:00 noon but that his color returned to normal after stimulation. At 1:35 p.m. on the 27th (the day of birth), the on-duty nurse noted that no suck reflex was detectable on Gregory.

By 2:00 p.m. Gregory was with his mother in her room. Hospital records reflect that she was caring well for the baby's needs. The baby stayed with Mrs. Gendek for several hours—at least

until 8:00 p.m. and most likely until 10:00 p.m. Hospital records reflect that at all times, Mrs. Gendek was properly caring for Gregory. At one point during the baby's stay with his mother in her room, Mrs. Gendek noticed that the baby's hands and feet were purple. Somewhat alarmed, she informed a nurse of that fact, but the nurse responded: "he's fine honey—just cover him up with 2 blankets." According to Mrs. Gendek, she returned her son to the Nursery at approximately 10:00 p.m.

At 6:00 a.m. the following day, Mrs. Gendek went to the Nursery to check on her baby. Gregory was sleeping on his stomach, and Mrs. Gendek then returned to her room. At approximately 8:00 a.m., Tracy Gergel, a nurse and co-defendants, discovered that Gregory was unresponsive in his bed. Nurse Gergel called co-defendant Nurse Jean Magaulliri. Nurse Magaulliri began cardiopulmonary resuscitation. Gregory's chart described his condition as follows:

> Baby on abdomen—face turned slightly to side. Turned baby over, no respiration or chest movement noted. Skin color mottled and cold to touch. Muscle tone floppy. Stimulated baby with no response and called for help.... They immediately began respirations with an ambubag and mask at 100% 0 [sic]. Marie Shickler, lead nurse SNC arrived and began cardiac compressions.... Baby transported to SCN in crib. CPR maintained continuously.

Then, several nurses rushed into Mrs. Gendek's room. They told her that Gregory was having a problem and that she should go to the Nursery at once. There, Mrs. Gendek witnessed a team of medical personnel and others huddled around her son. In her words, she described the scene as follows:

> And when I went out in the hallway, I saw the nurses around. I saw a Minister which [sic] I didn't know was a Minister at the time standing in the hallway. I looked through the glass and I saw about 5 or 6 people around him, pumping on his chest, and they were wheeling in an I.V. bottle.

One of the nurses grabbed Mrs. Gendek by the arm and told her to call her husband and a family priest, if she had one. She called her husband and told him to come to the hospital immediately because Gregory was "not breathing."

The team of doctors and nurses managed to restore Gregory's heartbeat. During the subsequent course of treatment, Gregory

was transferred from Mercer Medical Center to Robert Wood Johnson Hospital and then back to Mercer Medical Center. Nurses' notes from the Nursery at Mercer Medical Center and the Nursery at Robert Wood Johnson Hospital reflect that Mr. and Mrs. Gendek were constantly at Gregory's bedside. During their constant vigil, they witnessed Gregory experiencing severe convulsions, undergoing suction treatment, and enduring numerous intravenous treatments, examinations, and tests, including ice water in his ears, fingers down his throat, and poking of his eyes.

After several days, doctors implanted permanent ventilatory and nutritive tubes into Gregory's body. From the outset, doctors told the Gendeks that even if Gregory survived, he would be in a permanent vegetative state. On November 10, 1987, forty-five days after Gregory's birth, the Gendeks elected to terminate artificial care, and Gregory died.

Almost five years after Gregory's death, the Gendeks were examined by Dr. Richard Rubin, a neuropsychiatrist. Dr. Rubin concluded that both Mr. and Mrs. Gendek suffer from a condition known as "Uncomplicated Bereavement." That condition, according to Dr. Rubin, "is characterized by obsessive preoccupation with feelings of guilt about things that were done, or not done by the survivor at the time of death of [a] loved one." In the case of Mrs. Gendek, the condition has caused the onset of major depression "with characteristics of recurrent crying spells, feelings of self-reproach, [and] impairment of concentration." As for Mr. Gendek, Dr. Rubin was of the opinion that Mr. Gendek has repressed his emotions, resulting in a "blunting of affect and response to his own inner life."

The Gendeks brought an action for compensatory damages against several defendants, including the doctors, nurses, and hospital, allegedly responsible for causing their child's death. After defendants had answered plaintiffs' complaint, defendants Mercer Medical Center moved for partial summary judgment seeking dismissal of the claim for negligent infliction of emotional distress. The court granted the motion, and plaintiffs moved for

leave to appeal, which the Appellate Division denied. On a motion for reconsideration, the trial court reaffirmed its earlier decision. Plaintiffs again moved for leave to appeal, which the Appellate Division granted. In a reported decision, 269 *N.J.Super.* 599, 636 *A.*2d 113 (1994), the court affirmed the trial court's dismissal of the parents' claim for negligent infliction of emotional distress.

## II

Our Court has recognized a claim for negligent infliction of emotional distress in cases in which a person who is the direct object of a tortfeasor's negligence experiences severe emotional trauma as a result of the tortfeasor's negligent act or omission. *See, e.g., Giardina v. Bennett,* 111 *N.J.* 412, 545 *A.*2d 139 (1988) (recognizing claim for negligent infliction of emotional distress when medical malpractice during pregnancy resulted in stillborn child); *Strachan v. John F. Kennedy Memorial Hosp.,* 109 *N.J.* 523, 538 *A.*2d 346 (1988) (recognizing claim for negligent infliction of emotional distress when hospital negligently failed to release to parents their son's brain-dead corpse).

Our cases also recognize indirect claims for negligent infliction of emotional distress. Those arise in cases in which a person, not otherwise a direct object of a tortfeasor's negligence, experiences severe emotional distress when another person suffers serious or fatal injuries as a result of that negligence. *E.g., Portee v. Jaffee,* 84 *N.J.* 88, 417 *A.*2d 521 (1980). The cases recognizing such indirect claims for negligent infliction of emotional distress are sometimes referred to as bystander-liability cases. *E.g., Dunphy v. Gregor,* 136 *N.J.* 99, 101, 642 *A.*2d 372 (1994).

That kind of claim was first recognized by our Court in *Portee,* in which the Court permitted a mother's recovery for negligent indirect infliction of emotional distress because she had watched her son slowly die after being involved in an elevator accident caused by the defendant's negligence. The *Portee* Court held that although the mother herself had experienced no fear of being injured and had not suffered any physical injuries, she could

maintain a claim for negligent infliction of emotional distress because "(1) the death or serious physical injury of another [was] caused by defendant's negligence; (2) a marital or intimate familial relationship [existed] between plaintiff and the injured person; (3) [she had observed] the death or injury [of the victim] at the scene of the accident; and (4) [she had suffered] severe emotional distress." *Portee, supra,* 84 *N.J.* at 101, 417 *A.*2d 521.

◾ Claims for emotional distress that are either direct or indirect may arise when the negligence consists of medical malpractice. *E.g., Frame v. Kothari,* 115 *N.J.* 638, 560 *A.*2d 675 (1989); *Strachan, supra,* 109 *N.J.* 523, 538 *A.*2d 346. The special requirements for establishing an indirect claim for emotional distress that is based on medical malpractice are strictly applied. *See Frame, supra,* 115 *N.J.* at 651–52, 560 *A.*2d 675 (observing that expansion of medical malpractice to include indirect claims of emotional distress may increase actual and social costs of providing health care) (Wilentz, C.J., and Garibaldi, J., concurring).

◾ Medical malpractice giving rise to emotional-injury claims can involve obstetrical malpractice that occurs in the course of pregnancy with resultant serious or fatal injuries to the fetus or newborn and consequent severe emotional distress suffered by the parents. *E.g., Carey v. Lovett,* 132 *N.J.* 44, 622 *A.*2d 1279 (1993); *Giardina, supra,* 111 *N.J.* 412, 545 *A.*2d 139. In those cases, the Court has considered the claim of the mother to be more analogous to a direct claim for negligent infliction of emotional distress. As explained by the Court in *Giardina,* "the medical malpractice causing an infant stillbirth constitutes a tort against the parents, entailing the direct infliction of injury, their emotional distress and mental suffering, for which they are entitled to recover compensatory damages." 111 *N.J.* at 413, 545 *A.*2d 139. In reaching that conclusion the Court drew on cases involving so-called wrongful-birth and wrongful-life causes of action, which recognize direct claims by parents for the infliction of emotional distress from negligent advice or genetic counselling in anticipation of or during pregnancy, *see, e.g., Procanik v. Cillo,* 97 *N.J.* 339, 352, 478 *A.*2d

755 (1984) (holding that family could assert claim for negligent infliction of emotional distress against doctor who negligently interpreted a German measles test, thereby depriving parents of opportunity to consider terminating pregnancy); *Schroeder v. Perkel,* 87 *N.J.* 53, 63–64, 432 *A.2d* 834 (1981) (holding that parents could assert direct claim for emotional distress against doctor who failed to inform them of genetic risk of having another child); *Berman v. Allan,* 80 *N.J.* 421, 432, 404 *A.2d* 8 (1979) (holding that doctor's failure to inform parents of availability of amniocentesis that deprived parents of opportunity to terminate pregnancy forms basis of direct claim for negligent infliction of emotional distress).

In *Carey,* the Court considered more closely the nature of the cause of action for emotional distress in the context of obstetrical malpractice. The Court stressed that in situations in which obstetrical malpractice causes injury or death to a fetus, characterizing the pregnant mother's emotional distress claim as direct or indirect is difficult, and, inferentially, not especially helpful, in light of "[t]he unique relationship between a pregnant woman and her baby." 132 *N.J.* at 59, 622 *A.2d* 1279. In those situations, because a pregnant woman and her fetus are one physiological unit, any injuries suffered by the fetus necessarily occur through and in the course of directly treating the pregnant woman. *Ibid.* (observing that during pregnancy "the connection between a mother and her baby so merges 'direct' and 'indirect' claims that the distinction disappears").

If the obstetrical malpractice occurs during pregnancy, and the fetus, although born alive, suffers injuries that are ultimately fatal, the child may plausibly be considered as the primary victim. It does not necessarily follow, however, that the mother's claim for emotional distress that arises from the victimization of her infant should be considered an indirect claim. In that setting, the special requirements that are imposed to establish an indirect claim for negligent infliction of emotional distress, as exemplified by *Portee,* would appear to be superfluous. Those special requirements

serve to assure the genuineness of the claim for emotional distress and the basic fairness and reasonableness in imposing liability for that kind of emotional distress on the tortfeasor. However, no need exists, as recognized by *Carey,* to impose on the mother, who has herself been a victim of malpractice during pregnancy or the delivery of her child, the added requirements that she "be contemporaneously aware of the malpractice and the injury of her fetus" or be "shocked" by the malpractice. *Id.* at 60, 622 *A.*2d 1279. Her emotional distress over the condition and fate of her newborn baby is unquestionably immediate and genuine and inextricably related to the malpractice.

The issue posed on this appeal is whether the special requirements that are imposed to establish an indirect claim for emotional distress arising from medical malpractice apply under the circumstances of this case. We conclude that those requirements remain relevant and must apply to determine the sustainability of plaintiffs' cause of action.

The Gendeks' claim for the emotional distress arising from the death of their child is not a claim based on negligence or malpractice that was directed to the mother during pregnancy or child birth. Mrs. Gendek's claim is for emotional distress caused by nursing and medical malpractice on her infant child who was born alive, without complications. Plaintiffs do not allege medical malpractice that affected the fetus itself or that started during the end stage of pregnancy and continued during the birth process and thereafter until the child suffered a condition that proved fatal. In contrast, in Mrs. Carey's case, the claim was for "for emotional distress caused by malpractice on *the mother and fetus during childbirth.*" 132 *N.J.* at 58, 622 *A.*2d 1279 (emphasis added). Plaintiffs' claim is therefore distinguishable from the mother's claim in *Carey.*

*Carey,* moreover, did not relax the special requirements for a father's claim for indirect emotional distress attributable to the medical malpractice involving the mother during pregnancy or the birthing process. In that case, the father, unlike the mother, was

not a direct object of any medical malpractice, and consequently his claim was considered to be an indirect claim for emotional distress. He was, therefore, required to show that he had "contemporaneously observe[d] the malpractice and its effects on the victim and that he [had been] shocked by the results." *Id.* at 62, 622 *A.*2d 1279.

Mr. Gendek states at most an indirect claim for emotional distress arising out of the negligent treatment of his infant son. The sole allegation in the complaint is that after Gregory was born, "[d]efendant nurses negligently failed to put into effect monitoring procedures and devices, notify pediatricians or neonatologists of the infant's condition, transfer the infant to the high risk unit, or otherwise properly to act in the premises."

Because the alleged negligence in this case occurred after the completion of the birthing process, the standard announced in *Frame, supra,* controls the claims of both parents. *Frame* applied the standard enunciated in *Portee* in the context of medical malpractice. Under that standard, an indirect claim for emotional distress attributable to medical malpractice must be based on evidence demonstrating that the victim was (1) a marital or intimate family member of the claimant, and that the claimant (2) witnessed the malpractice, and (3) immediately connected or associated the malpractice with the injury, and (4) as a result, suffered severe emotional distress. *Frame, supra,* 115 *N.J.* at 643, 560 *A.*2d 675. Neither Mr. nor Mrs. Gendek observed any negligent act or omission that they immediately associated with Gregory's condition.

The Court in *Frame* rejected the claim of the parents for indirect infliction of emotional distress arising from a medical misdiagnosis or failure to act that later resulted in the death of their young son. The Court explained:

Our focus here is on the right of one family member to recover for the emotional distress caused by the medical misdiagnosis of another member of the family. A misdiagnosis may lead to tragic consequences that expose the negligent physician to claims for personal injuries or the wrongful death of the victim. By its nature, diagnosis is an intellectual undertaking, requiring the physician to analyze symp-

toms and reach a conclusion. The nature of a misdiagnosis is such that its results may neither manifest themselves immediately nor be shocking. Hours, days, or months may separate a misdiagnosis, the manifestation of the injury to the patient, and the family member's observation of the injury.

[*Id.* at 644–45, 560 *A.2d* 675.]

In *Lindenmuth v. Alperin,* 197 *N.J.Super.* 385, 484 *A.2d* 1316 (Law Div.1984), a mother was not allowed to recover for her emotional distress when a doctor's failure to diagnose an intestinal obstruction caused her new-born baby to die when it was three-days old. This Court in *Frame* noted that in *Lindenmuth* "the mother watched the deterioration of her child over a period of three days without appreciation of the impact of the doctor's act of malpractice." 115 *N.J.* at 645, 560 *A.2d* 675. It concluded that those facts

do not demonstrate that the defendant's failure to diagnose, the manifestation of that failure, and the death of the infant were sufficiently connected to support a claim for emotional distress. The distress that Mrs. Lindenmuth doubtless suffered could be as readily attributed to her understandable grief over the loss of her baby as to her observation of the baby and her knowledge that the doctor had failed to diagnose the cause of death.

[*Ibid.*]

The Court did recognize in *Frame* the possibility of a successful indirect claim for negligent infliction of emotional distress arising out of the medical misdiagnosis of a family member: "In an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress." *Id.* at 649, 560 *A.2d* 675.

Here, neither Mr. nor Mrs. Gendek observed any act of malpractice. *Cf. Polikoff v. Calabro,* 209 *N.J.Super.* 110, 506 *A.2d* 1285 (App.Div.1986) (recognizing indirect claim for infliction of emotional distress of mother who observed hyperalimentation of fluids through catheter in daughter's jugular vein, followed by daughter's death). Mrs. Gendek witnessed only the non-negligent resuscitative efforts by the team of medical personnel. Mr. Gendek, unlike Mrs. Gendek, did not even arrive at the scene until

after the resuscitation of Gregory had been accomplished. More importantly, neither Mr. nor Mrs. Gendek immediately connected any act of malpractice with Gregory's respiratory failure or the need to perform emergency medical procedures.

In rejecting the cause of action in this case, we appreciate in full measure the pathos and genuineness of plaintiffs' suffering. Mrs. Gendek delivered a healthy baby boy, who suddenly stopped breathing approximately twenty-four hours after birth. Had the medical personnel monitored the infant more closely, this tragedy might have been averted. The Gendeks have undoubtedly experienced deep and enduring emotional trauma as a result of the death of their son.

As Justice Pollock observed in *Frame*, "Everyone is subject to injury, disease and death. Common experience teaches that the injury or death of one member of a family often produces severe emotional distress in another family member." 115 *N.J.* at 642, 560 *A.*2d 675. Although the law recognizes that at times the severe emotional trauma accompanying the tortious death or injury of a family member may be compensable, such a claim is narrowly circumscribed in the context of a medical misdiagnosis or failure to act. In the context of health care, life and physical wellbeing are often at stake and frequently at risk, and injury and death are not unforeseeable. In considering the standards that govern an appropriate duty of care and limitations of liability in that setting, we must be especially mindful of the principles of sound public policy that are informed by perceptions of fairness and balance. We therefore insist that an immediate, close and clear involvement or connection be present between a person suffering emotional distress and the conduct of the professional healthcare providers whose fault has contributed to the grave or fatal injuries of a related loved one.

That high degree of involvement and connection is absent in this case. Nothing in the record demonstrates that the Gendeks' grief was especially augmented or that their emotional injury was uniquely exacerbated or intensified by the simultaneous awareness

and terrible realization that the tragedy of their son's fatal condition, the onset of which they witnessed, was caused by nursing and medical malpractice that was occurring in their presence.

## III

We affirm the judgment of the Appellate Division.

STEIN, J., dissenting.

In this medical-malpractice case, a mother who had delivered a healthy baby boy was informed by nurses approximately twenty-four hours after birth about a "problem" with her baby. She rushed to the nursery, discovered that the baby had stopped breathing, and saw a team of physicians and nurses using cardiac compressions and respirational aids in an attempt to resuscitate the infant. She was told to call her husband and to summon a family priest. Although medical personnel were able to restore the infant's heartbeat, the loss of oxygen to the brain caused severe brain damage. The parents were informed that even if the baby survived he would be in a permanent vegetative state. Both parents observed the future course of the infant's treatment, including the insertion of respirational and nutritional tubes, during the forty-five-day period that terminated with his death.

The Court holds that notwithstanding evidence of severe emotional distress, and irrefutable evidence that the mother was present and directly observed the infant's injury sustained as a result of the alleged malpractice, the mother's claim for emotional-distress damages is barred because she did not observe and was unaware of the antecedent nursing and medical malpractice that allegedly caused her infant son to stop breathing. *Ante* at 302–303, 654 *A*.2d at 975–976. The allegations of malpractice focus on the failure of the hospital staff to respond to discernible symptoms of distress and to seek expert intervention before the infant lost consciousness on the morning following his birth. In my view, the requirement that the mother observe and be aware of the malpractice overstates our holding in *Frame v. Kothari*, 115 *N.J.* 638,

560 *A*.2d 675 (1989), and imposes an artificial exclusion from the already narrow category of cases in which we recognize claims for emotional distress based on injury to a loved one.

Recognition of a cause of action for emotional distress caused by the death or serious bodily injury of a loved one derives from our holding in *Portee v. Jaffee*, 84 *N.J.* 88, 417 *A*.2d 521 (1980). There, the plaintiff's seven-year-old son became trapped in the elevator of a Newark apartment building, between the elevator's outer door and the wall of the elevator shaft. When the elevator was activated, the boy was dragged up to the third floor. For approximately four and one-half hours the mother watched as police officers struggled to free him. He died while trapped in the elevator, having suffered multiple bone fractures and massive internal hemorrhaging. The plaintiff's action against the building's owner and the two elevator companies responsible for maintaining the elevator was based on the defendants' failure to provide a safe elevator. In addition to the survival and wrongful-death claims that she asserted in her representative capacity, the mother also sued individually for her mental and emotional distress resulting from the observance of her son's suffering and death. In *Portee*, we recognized a cause of action for negligent infliction of emotional distress based on proof of the following elements: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 101, 417 *A*.2d 521.

Our holding in *Portee* imposed no requirement that the plaintiff observe the negligent act that caused the injury. We also rejected as arbitrary the requirement imposed by *Falzone v. Busch*, 45 *N.J.* 559, 569, 214 *A*.2d 12 (1965), that the plaintiff be subjected to risk of physical harm, but noted that "the scope of recovery must be circumscribed to negligent conduct which strikes at the plaintiff's basic emotional security." *Portee, supra*, 84 *N.J.* at 99, 417

A.2d 521. Accordingly, we limited the cause of action for emotional distress only to those family members who observed the death or injury at the scene of the accident:

> Discovering the death or serious injury of an intimate family member will always be expected to threaten one's emotional welfare. Ordinarily, however, only a witness at the scene of the accident causing death or serious injury will suffer a traumatic sense of loss that may destroy his sense of security and cause severe emotional distress. * * * Such a risk of severe emotional distress is present when the plaintiff observes the accident at the scene. Without such perception, the threat of emotional injury is lessened and the justification for liability is fatally weakened. The law of negligence, while it redresses suffering wrongfully caused by others, must not itself inflict undue harm by imposing an unreasonably excessive measure of liability. Accordingly, we hold that observing the death or serious injury of another while it occurs is an essential element of a cause of action for the negligent infliction of emotional distress.
>
> [*Id.* at 99–100, 417 A.2d 521.]

Nor do the cases applying the *Portee* rule reflect any requirement that observation and awareness of the negligent act that caused the death or injury is a prerequisite to recovery. For example, in *Polikoff v. Calabro,* 209 *N.J.Super.* 110, 506 A.2d 1285 (App.Div.1986), the defendant anesthesiologist's misplacement of a catheter in a child's jugular vein during surgery resulted in the accumulation of hyper-alimentation fluid in the child's pericardial sac, causing her death. The child's mother was with her when the hyper-alimentation began, and witnessed her distress as well as the unsuccessful efforts to resuscitate her. The court held that the mother's observation of the introduction of hyper-alimentation fluid into the incorrectly positioned catheter and the child's resultant injury and death were sufficient to satisfy *Portee*'s requirements for a cause of action to recover emotional-distress damages. *Id.* at 114–15, 506 A.2d 1285. No requirement that the mother observe or be aware of the negligent misplacement of the catheter was imposed.

Similarly, in *Mercado v. Transport of New Jersey,* 176 *N.J.Super.* 234, 422 A.2d 800 (Law Div.1980), the mother of the eight-year-old decedent did not witness her child being struck by defendant's bus, but learned of the accident moments later when her daughter told her what had happened. The plaintiff ran

outside and saw her son lying in the street, unconscious and severely injured. The court held that the mother's observation of the child at the accident scene shortly after the actual impact satisfied the requirements of *Portee*, notwithstanding that the mother had not observed the impact or the allegedly negligent conduct of the defendants. *Id.* at 238, 422 *A.*2d 800.

Our holding in *Portee* relied significantly on the California Supreme Court's decision in *Dillon v. Legg*, 68 *Cal.*2d 728, 441 *P.*2d 912, 69 *Cal.Rptr.* 72 (1968), which held that a bystander's cause of action for emotional-distress damages depended on three factors:

"(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship."

[*Portee, supra,* 84 *N.J.* at 97, 417 *A.*2d 521 (quoting *Dillon, supra,* 68 *Cal.*2d at 740, 441 *P.*2d at 920, 69 *Cal.Rptr.* at 80).]

Applying the *Dillon* guidelines, a California appellate court had occasion specifically to consider whether in a malpractice context *Dillon* requires that the plaintiff observe and be aware of the negligent act as a prerequisite to recovery. In *Mobaldi v. Board of Regents,* 55 *Cal.App.*3d 573, 127 *Cal.Rptr.* 720 (1976), *overruled on other grounds, Baxter v. Superior Court,* 19 *Cal.*3d 461, 563 *P.*2d 871, 138 *Cal.Rptr.* 315 (1977) (in banc), a foster mother brought an action against a university medical center and two physicians to recover emotional-distress damages on the basis of injuries inflicted on a foster child by an injection of overstrength glucose solution in the course of a pyelogram, an x-ray procedure designed to enhance the visibility of the organ to be studied. The procedure contemplated injection of a dye as part of a five-percent glucose solution, but a physician mistakenly used a fifty-percent glucose solution. While in the presence of his foster mother, the child began to breathe peculiarly. In a short time, the child became spastic and convulsant, and eventually comatose. The child suffered irreversible brain damage, and became quadriplegic,

permanently blind and severely retarded. The foster mother's complaint sought, among other relief, emotional-distress damages because of the depression and distress she had experienced as a direct consequence of witnessing the child's injury.

In determining whether the plaintiff satisfied the *Dillon* guideline that her distress result from "a direct emotional impact * * * from the sensory and contemporaneous observance of the accident," *Dillon*, 68 *Cal.*2d at 740, 441 *P.*2d at 920, 69 *Cal.Rptr.* at 80, the court distinguished between requiring observation of the act of malpractice and observation of its consequences:

> Foreseeability depends upon what the emotionally traumatized plaintiff observes. It is observation of the consequences of the negligent act and not observation of the act itself that is likely to cause trauma so severe as to result in physical injury.
>
> So long as the plaintiff's observation of the results of the defendant's infliction of harm upon another is direct and contemporaneous, there is no significance in the plaintiff's lack of awareness that the defendant's conduct inflicting the injury is negligent. To reason otherwise would deny the protection of *Dillon* to a mother observing a child killed by a driver, whose only negligence is his intoxication, simply because the mother can not be aware of the fact of drunkenness until after the accident.
>
> [*Mobaldi, supra,* 127 *Cal.Rptr.* at 727.]

In *Ochoa v. Superior Court,* 39 *Cal.*3d 159, 703 *P.*2d 1, 216 *Cal.Rptr.* 661 (1985), the California Supreme Court endorsed that aspect of the holding in *Mobaldi,* describing as anomalous a requirement that a "plaintiff must be aware of the tortious nature of defendant's actions." *Id.* at 170, 703 *P.*2d at 8, 216 *Cal.Rptr.* at 668.

Our holding in *Frame, supra,* should not be understood to impose a requirement, in all cases involving bystander emotional-distress claims based on malpractice, that the bystander observe both the malpractice and its consequences. The requirement that the bystander be aware of the malpractice and its consequences was introduced in *Frame* as an accommodation, in recognition of the fact that many malpractice cases would not involve "observation of the death or injury at the scene of the accident," *Portee, supra,* 84 *N.J.* at 101, 417 *A.*2d 521, in a context sufficiently

shocking to satisfy the *Portee* guidelines. We noted in *Frame* that

> diagnosis is an intellectual undertaking, requiring the physician to analyze symptoms and reach a conclusion. The nature of a misdiagnosis is such that its results may neither manifest themselves immediately nor be shocking. Hours, days, or months may separate a misdiagnosis, the manifestation of the injury to the patient, and the family member's observation of the injury. Thus, the event may not cause the simultaneous concurrence or rapid sequence of events associated with a shocking event. The observing family member will not be exposed to the harm of seeing a healthy victim one moment and a severely injured one the next.
>
> [115 *N.J.* at 644–45, 560 *A.2d* 675.]

To illustrate its point, the Court's opinion in *Frame* reviewed a number of malpractice cases in which a bystander's claim for emotional-distress damages had been denied. *Id.* at 645–47, 560 *A.*2d 675. We noted that

> the common thread running through these cases is that a misdiagnosis normally does not create the kind of horrifying scene that is a prerequisite for recovery. Rarely will a member of the patient's family contemporaneously observe the immediate consequences of the defendant's misdiagnosis, and even more rarely will the results of the misdiagnosis be the injury or death of a loved one contemplated by the gruesome scene portrayed in *Portee*.
>
> [*Id.* at 647–48, 560 *A.*2d 675.]

Accordingly, the *Frame* opinion offers a modification of the standard *Portee* framework, to permit bystander recovery of emotional-distress damages in a malpractice context that does not meet the *Portee* guidelines: "In an appropriate case, if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress. Such an event could be shocking." *Id.* at 649, 560 *A.*2d 675.

In my view, *Frame*'s modification of *Portee* should be understood as an exception from, not as a substitute for, the *Portee* guidelines. If in a malpractice case the family member does not observe directly the act of malpractice, but directly witnesses the death or serious bodily injury resulting from the malpractice in a setting that satisfies *Portee*'s contemplation of a traumatic emotional event, 84 *N.J.* at 99–101, 417 *A.*2d 521, a requirement that

the observer also have witnessed and been aware of the malpractice appears to be redundant. As the court noted in *Mobaldi, supra:* "It is observation of the consequences of the negligent act and not observation of the act itself that is likely to cause trauma so severe as to result in physical injury." 127 *Cal.Rptr.* at 727.

That principle has specific relevance to the facts before us. Whether Mrs. Gendek was aware that the pediatric nurses had deviated from generally accepted standards in the hours following her son's birth is of limited significance when compared to the trauma that she claims to have experienced the following morning when she was summoned to the nursery to watch a team of physicians attempt unsuccessfully to resuscitate her baby in time to avoid irreversible brain damage.

We noted in *Frame* that the line-drawing responsibility of courts, in distinguishing recoverable claims from those in which compensation is denied, invites claims of arbitrariness. 115 *N.J.* at 649, 560 *A.2d* 675. To avoid arbitrary rules and results, we must on occasion clarify lines previously drawn to serve better the interests of justice. The Court should make clear that a bystander's medical-malpractice action for emotional-distress damages that satisfies the *Portee* standards should succeed even if the plaintiff was unaware of the malpractice when it occurred.

I would reverse the judgment of the Appellate Division and remand the matter for trial.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For reversal and remandment*—Justice STEIN—1.