Timothy ARMSTRONG and Lynn Armstrong, administrators of the estate of Thomas John Armstrong, deceased, and in their own right, Plaintiffs,

v.

A.I. DUPONT HOSPITAL FOR CHILDREN, Nemours Foundation, Steven P. Cook, M.D., Samuel Earl Wilson, M.D., Defendants.

Civil Action No. N11C–06–146 JOH.

Superior Court of Delaware,
New Castle County.

Submitted: Oct. 4, 2011.
Decided: Jan. 31, 2012.

Joseph J. Farnan, III, Esquire, Brian E. Farnan, Esquire, and Rosemary J. Piergiovanni, Esquire, of Farnan LLP, Wilmington, Delaware, and Dion G. Rassias, Esquire, James E. Beasley, Jr., Esquire, and Catherine A. Rothenberger, Esquire, of the Beasley Firm, LLC, Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

Kevin S. Mann, Esquire, of Cross & Simon, LLC, Wilmington, Delaware, and Sara Lynn Petrosky, Esquire, and Richard E. Geschke, Esquire, of McCann & Geschke, P.C., Philadelphia Pennsylvania, Attorneys for Defendants.

### *MEMORANDUM OPINION*

HERLIHY, Judge.

Plaintiffs Timothy and Lynn Armstrong, individually, and as administrators of the estate of their five year old minor son, Thomas, ("plaintiffs") have sued various defendants for medical negligence and wrongful death. The individual defendants are Dr. Steven P. Cook ("Dr. Cook") and Dr. Samuel Earl Wilson ("Dr. Wilson") (collectively "individual defendants"). Plaintiffs have also sued the A.I. DuPont Hospital for Children ("Hospital") and the Nemours Foundation ("Nemours") (collectively "institutional defen-

dants").[1] Their action is for medical negligence against Drs. Cook and Wilson, medical negligence against the Hospital on the basis of *respondent superior*, corporate negligence against the institutional defendants, a wrongful death action against all defendants, a survivorship action against all defendants and a claim for negligent infliction of emotional distress against all defendants. Plaintiffs also seek punitive damages from the individual defendants.

The defendants have moved to dismiss portions of the plaintiffs' claims. Drs. Cook and Wilson have moved to dismiss plaintiffs' claims for punitive damages arguing the alleged conduct does not rise to the level of wrongdoing necessary for such a claim. The institutional defendants assert that Delaware law limits negligence claims against a hospital defendant, and plaintiffs' claims are not included in the limited claims allowed.

All defendants seek dismissal of the claim for negligent infliction of emotional distress contending the adult plaintiffs were not in the requisite "zone of danger" which would entitle them to recover for such a claim. The court holds that the "zone of danger" extends to these adult plaintiffs as third parties who witnessed the active peril caused by others' negligence.

A motion to dismiss tests the sufficiency of the complaint and nothing more. It is a threshold review to determine whether, under any reasonably conceivable circumstances, plaintiffs can prove that they can recover. As to all defendants and all claims at this procedural posture, the Court finds plaintiffs' complaint meets that test. Defendants various motions to dismiss are **DENIED**.

### Factual Background & Procedural Posture [2]

Starting sometime in 2009, Thomas began experiencing mouth breathing, obstructive sleep apnea ("OSA"), restless sleep pattern and snoring. Timothy and Lynn took Thomas to A.L. DuPont Hospital on March 12, 2010 for an appointment with Dr. Cook, an ear, nose and throat specialist. Dr. Cook diagnosed Thomas with large tonsils, snoring and obstructive sleep apnea with acute otitis media in the left ear. Dr. Cook recommended a surgical procedure—tonsillectomy and adenoidectomy—due to large tonsils with upper airway obstruction.

Thomas underwent the recommended surgical procedure on April 7, 2010 in the Hospital's short procedure unit. Dr. Wilson provided anesthesia services for the surgery. Thomas was transferred to the pre-op holding area around 1:00 p.m. where Nurse Pagonis administered 12 mg oral Versed, a sedative. Administration of the anesthesia medicines began at 1:17 p.m. The initial bolus anesthesia drug totals included Propofol (260 mg), Fentanyl (60 mcg) and respiratory drug Sevoflurane (21.01 ml). Before the procedure began, Dr. Cook issued a discharge order contingent upon certain conditions. Those conditions were that Thomas must tolerate post-operative care well, his vital signs sta-

1. The institutional defendants assert A.I. DuPont Hospital is not a separate entity but is operated by Nemours. Compare, however, *Conway v. A.I. Dupont Hospital for Children*, 2009 WL 57016 (E.D.Pa. Jan. 6, 2009). The Court directs the parties to rectify this matter within thirty days of the date of this opinion.

2. The Factual Background is derived from the plaintiff's complaint, defendants' motion to dismiss and plaintiffs reply in opposition to defendants' motion to dismiss. For the purposes of this motion, all well-pled allegations are taken as true. The Court's analysis of the motions to dismiss, however, is based solely on the allegations in the complaint.

ble, "PACU criteria" met and no bleeding, emesis or respiratory distress.

Surgery began at 1:19 p.m. and ended at 1:51 p.m. Thomas was transferred to the post-op area at 1:56 p.m. While in the post-op area, Nurse Brown administered Nubain (.5 mg) (a synthetic opiod used as an analgesic) at 2:07 p.m. and 2:14 p.m., IV Morphine (1.5 mg) at 2:29 p.m., and Lortab (6.05 ml)—consisting of Codine and Tylenol at 3:00 p.m. Nurse Brown noted, "Calming after dose of morphine. Large amount of thick clear oral secretions. Reminded to swallow." Thomas fell asleep sometime shortly after being given Lortab.

Thomas was discharged from the post-op area around 3:50 p.m. Timothy and Lynn were concerned and outraged when they saw that Thomas was being discharged because he had not regained consciousness after receiving Lortab. Thomas was unresponsive and "dead" weight when he was loaded into a wagon and wheeled to Timothy and Lynn's car. Once Thomas arrived at his home, his parents carried him inside and placed him on a bed.

Around 6:00 p.m., Timothy and Lynn found Thomas unresponsive and not breathing. They called 911 to request assistance. Police and fire personnel responded and began resuscitative efforts on Thomas. Members of the Claymont Fire Company EMS transported Thomas back to A.I. DuPont Hospital, this time to the emergency room. Shortly thereafter, Thomas was pronounced dead. The cause of death listed on Thomas' death certificate is "respiratory arrest associated with opiod

analgesia (morphine and hydrocodone) status post tonsillectomy."

### *Parties' Contentions*

The claim against Dr. Cook is stated in Count I and the claim against Dr. Wilson in Count II. Both Counts assert claims for punitive damages. The basic allegations against the doctors are identical.

Defendants Cook and Wilson seek dismissal of the punitive damages claim because the acts alleged amount to no more than medical negligence.[3] Such conduct, the individual defendants argue, does not rise to the statutorily required state-of-mind under Delaware medical negligence law of either malicious intent or willful or wanton conduct which would permit the recovery of punitive damages. Plaintiffs respond contending the allegations do meet the necessary element of willful or wanton conduct.

The institutional defendants are sued for corporate negligence in Counts IV and V. The claims against them are stated in identical language. These defendants argue that Delaware recognizes very limited claims of direct negligence against hospitals. None of the claims plaintiffs make, they contend, fall within the limited claims allowed. Plaintiffs, in turn, argue that there are no such limitations and, further, the claims they make fall within any such "limitations."

Count VIII asserts a claim for negligent infliction of emotional distress against all defendants. Defendants argue that an essential element of such a claim is that the plaintiffs were in the "zone of danger." They continue by emphasizing the plain-

---

**3.** Plaintiffs seek punitive damages only against the doctors, but in their *ad damaum* clauses in Count I and Count II they seek punitive damages against "all defendants." In none of their other *ad damaum* clauses against the institutional defendants or when making claims against all defendants, however, do they demand punitive damages. Consequently, the Court assumes punitive damages are sought only against Drs. Cook and Wilson. The plaintiffs will need to clarify promptly.

tiffs were not, nor do they contend they were, in the "zone of danger" as required; basically that they were not in fear of injury to themselves. Because plaintiffs' have not sufficiently alleged this essential element of this claim, all defendants ask the Court to dismiss Count VIII. Plaintiffs, apparently recognizing that Timothy and Lynn were not in the traditionally recognized "zone of danger" as they were not in peril, ask this Court to modify the requirements for a claim of negligent infliction of emotional distress "to provide Plaintiffs with justice." In the alternative, plaintiffs request leave to amend the complaint to assert a claim for intentional infliction of emotional distress.

### Standard of Review

The test for sufficiency in judging a motion to dismiss for failure to state a claim under Superior Court Civil Rule 12(b)(6) is a broad one; that is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.[4] All well-pled allegations are taken as true and all reasonable inferences shall be in favor of the non-moving party.[5]

### Discussion

#### Punitive Damages: Counts I and II

■■■■ The individual defendants, the doctors, move this Court to dismiss plaintiffs' claim for punitive damages.[6] Punitive damages are not meant to compensate plaintiffs but rather to deter bad conduct

of defendants.[7] In medical malpractice cases, entitlement to punitive damages is governed by statute and they may only be awarded when an injury is inflicted with malicious intent or is the product of wilful or wanton misconduct.[8] Further, an award of punitive damages should only be entered after a careful examination of whether the defendant's conduct is outrageous because of evil motive or reckless indifference.[9] Plaintiffs assert that their claim for punitive damages is based on the wilful or wanton misconduct of Drs. Cook and Wilson. "Wilful and wanton misconduct is analogous to the conscious indifference or disregard for the rights of others and has commonly been referred to as the 'I don't care' attitude."[10]

In order to survive this motion to dismiss, plaintiffs must sufficiently allege that actions of the individual defendants were so reprehensible that they cannot be tolerated by society. In their complaint, plaintiffs allege:

5. On or about 04/07/2010, Dr. Cook performed the tonsillectomy and adenoidectomy on five year old Thomas Armstrong at DuPont Children's Short Procedure Unit. At approximately 1:00 p.m., Thomas was transferred to the pre-op holding area, where he was given pre op medications, 12 mg oral Versed given by Nurse Pagonis. Originally ordered by Nurse Practitioner Baron.

6. At approximately 1:17 p.m., anesthesia for the operative procedure was begun. The anesthesiologist of record was

---

4. *Spence v. Funk,* 396 A.2d 967, 968 (Del. 1978).

5. *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896–97 (Del.2002).

6. *See* note 3, *supra,* concerning the confusion created in the plaintiffs' complaint whether the claims for punitive damages involve only the doctors.

7. *Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 528 (Del.1987).

8. 18 *Del. C.* § 6855.

9. *Pattanayak v. Khan,* 2005 WL 2660080, at *4 (Del.Super. Sep. 12, 2005).

10. *Id.* at *2.

Samuel Earl Wilson, M.D. The initial bolus anesthesia drug totals include Propofol (260 mg), Fentanyl (60 mcg) and respiratory drug Sevoflurane (21.01 ml).

7. At approximately 1:19 p.m., there was a Doctor's order from Dr. Cook, taken off by Nurse Brown to discharge the patient if there was no bleeding, emesis, or respiratory distress, after two hours, if tolerating PO well, vital signs stable, and "PACU criteria" met.

8. At approximately 1:19 p.m. the procedure began, and as per the medical record, ended at 1:51 P.M. At or about 1:53 p.m., Dr. Cook dictated his operative note. Thomas was transferred to the post op area at 1:56 pm.

9. At 2:07 p.m. and at 2:14 p.m., 0.5 Mg of Nubain was administered to Thomas Armstrong, by Nurse Brown.

10. At 2:29 p.m., 1.5 milligrams IV morphine was given by Nurse Brown. A Post-op note by Tonia Brown, R.N. at 2:34 p.m. notes, "Calming after dose of morphine. Large amount of thick clear oral secretions. Reminded to swallow."

11. At 3:00 p.m., Lortab (codeine and Tylenol), 6.05 ml was documented as given by Nurse Brown. After being given fluids, Thomas fell asleep.

12. At 3:50 p.m., Thomas was discharged to home from the post-op area. He was dressed without ever waking up. Parents were concerned and outraged at Thomas's condition upon discharge. They noted he was unresponsive, and 'dead weight' as he was loaded into a wagon and wheeled to their car. The documented assessment by Nurse Brown notes no particular expression or smile, legs are in normal position and relaxed, lying quietly, normal position, moves easily, there's no crying—Thomas never achieved an assessable level of consciousness/alertness after his 3:00 p.m. dose of Lortab.

13. Thomas was carried in from the car and placed in his bed at home. At approximately 6:00 p.m., parents found him not breathing. 911 was called by the parents and police responded and began resuscitative efforts on Thomas Armstrong.

14. Claymont Fire Company EMS responded and continued resuscitative efforts. Thomas was brought back to the hospital emergency room, where he was pronounced dead. Thomas never woke up after his 3:00 p.m. dose of opiod medication.[11]

In other paragraphs in Counts I and II, additional allegations are made in identical language against each doctor:

19. Dr. Cook (Dr. Wilson) knew, or had reason to know, of the facts and risks of post operative complications of children with severe obstructive sleep apnea, (hereinafter, OSA), the sensitivity of children with OSA and the increased risk of depressive respiratory effects hours after emergence from anesthesia. Dr. Cook (Dr. Wilson) failed to assess Thomas for this risk or treat this patient with OSA, who had received multiple narcotic analgesics, in accordance with the standard of care, which required a longer period of observation following surgery. This deviation in the standard of care resulted in loss of chance of survival, and ultimately death.

. . . .

21. The following acts and omissions of the defendant(s) caused the death of, increased harm to or caused loss of chance of survival for Thomas Armstrong, deviating from the standard of care by:

11. Pl.'s Compl. ¶¶ 5–14.

a. Failing to asses Thomas Armstrong for the severity of his OSA, prior to performing the surgical procedural;

b. Administering multiple opiods during the surgical procedure, with the knowledge of Thomas Armstrong's OSA;

c. Failure to assess for the effects of increased risk of depressive respiratory effects hours after emergence from anesthesia, in a child with OSA;

d. Failure to admit Thomas Armstrong to the hospital for overnight observation or observe Thomas for a longer period of time, in response to the increased risk of depressive respiratory effects hours after emergence from anesthesia, in a child with OSA.[12]

Plaintiffs have alleged sufficient facts to show, on a motion to dismiss, that the actions of the individual defendants amounted to a willful and wanton disregard for the rights of Thomas. They allege subsequent bodily injury, sickness and mental illness as a result. The determination of whether plaintiffs can produce sufficient evidence showing either or both of the individual defendants acted willfully and wantonly can be addressed at later stages of this case. As this time, however, plaintiffs' complaint is sufficient to support a claim for punitive damages. The individual defendant's motion to dismiss the punitive damages claims against them in Counts I and II is **DENIED.**

### Direct Negligence Claims against Institutional Defendants:  Counts IV and V

■ The traditional *respondeat superior* liability for negligence by servants, agents and employees is alleged in Count III against the Hospital. Counts IV and V, however, allege the Hospital and Nemours were negligent in their own right. The institutional defendants contend that direct claims of their alleged negligence are outside the "limitations" Delaware law places on claims against hospitals. The allegations in each Count are stated in identical language:

31. The aforementioned personal injuries and losses of the decedent were caused by the named defendants, acting by and through its agents, servants and employees, in their care of Thomas Armstrong, who knew, or had reason to know, of the facts and risks of post operative complications of children with severe obstructive sleep apnea, (hereinafter, OSA), the sensitivity of children with OSA and the increased risk of depressive respiratory effects hours after emergence from anesthesia, but failed to assess Thomas for this risk of treat this patient with OSA in accordance with the standard of care. This deviation in the standard of care resulted in loss of chance of survival, and ultimately death.

32. The following negligent acts and omissions of the defendant[s], caused the death of, increased harm to or caused the loss of chance of survival to Thomas Armstrong:

a. Failure to select and retain competent physicians and nurses to treat decedent and assure quality of care for the decedent to make certain that defendants would assess and treat the decedent in accordance with the standard of care, given the facts and risks of post operative complications of children with severe obstructive sleep apnea;

b. Failure to formulate, adopt and enforce adequate rules and policies to assure quality care for the decedent to make certain that defendants would assess and treat the decedent in ac-

---

12. Pl.'s Compl. ¶¶ 19, 21, 24 and 26.

cordance with the standard of care, given the facts and risks of post operative complications of children with severe obstructive sleep apnea;

c. Failure to have in place a policy or procedure to assure that defendants would assess and treat the decedent in accordance with the standard of care, given the facts and risks of post operative complications of children with severe obstructive sleep apnea;

d. Failure to oversee and supervise physician and nurses, as to patient care; and assure that defendants would assess and treat the decedent in accordance with the standard of care, given the facts and risks of post operative complications of children with severe obstructive sleep apnea;

e. Failure to monitor the competence of the health care providers who were acting as agents (expressed, implied, apparent, ostensible, or otherwise), or servants of the hospital during Thomas Armstrong's 04/07/2010 anesthesia and surgery, to assure that defendants would assess and treat the decedent in accordance with the standard of care, given the facts and risks of post operative respiratory complications of children with severe obstructive sleep apnea[.] [13]

The institutional defendants ask this Court to dismiss these claims because they are not the type of negligence claims permitted by Delaware law against hospital defendants. However, the institutional defendants did not support this argument with citation to any authority in their motion. In that motion, the institutional defendants provided citations to prior cases where negligence claims were permitted against hospital defendants, contending that those cases comprise the only kind of negligence claims permissible against a hospital defendant. In opposition to the institutional defendants' motion, plaintiffs indicate they cannot find any authority supporting only limited direct negligence claims against a hospital defendant.

The first of three cases the institutional defendants cite is *Register v. Wilmington Medical Center, Inc.*[14] The claims against the Medical Center were that (1) its employees negligently injured the plaintiff's minor child and (2) it negligently failed to supervise the conduct of its employees. The physician who performed the procedure was a first year resident. Superior Court had ruled inadmissible various evaluation reports raising questions about the resident's knowledge and skill. While the reports could not be used to show the doctor was negligent in this particular procedure, they were admissible on the issue of whether the hospital was negligent in supplying him to do the procedure or its supervision of him.[15] If anything, *Register* supports the kind of claims plaintiffs' make against the institutional defendants.

Next, the institutional defendants cite *Greene v. Beebe Medical Center, Inc.*[16] The issue was the admissibility of evidence of a suspension of a doctor's medical license in South Carolina. He was part of a medical group in Delaware and while working for them performed a delivery at Beebe. Superior Court ruled inadmissible use of the South Carolina suspension action in plaintiffs' claim against the medical group for negligent supervision and inadequate peer review. The Supreme Court upheld the inadmissibility decision noting the question

13. Pl.'s Compl. ¶¶ 31, 32, 34 and 35.

14. 377 A.2d 8 (Del.1977).

15. *Id.* at 11.

16. 663 A.2d 487, 1995 WL 420808 (Del. Jul. 11, 1995)(TABLE).

was close but that the probative value was outweighed by the risk of unfair prejudice.[17] This case hardly supports the institutional defendants' argument regarding limitations on direct negligence claims against hospital defendants.

The third case cited in their motion is *Riggs National Bank v. Boyd.*[18] Beebe Hospital was one of the defendants and a claim against it related to the negligent credentialing of a doctor; curiously the same doctor involved in *Greene.* The issues which Beebe raised were correct, but neither had to do with any limits on direct negligence claims against hospitals. Beebe moved for summary judgment because plaintiffs' expert on credentialing lacked the knowledge or experience to competently testify and because certain records were privileged and unavailable to plaintiffs on their credentialing claim. The Court concurred with Beebe's arguments. First, the Court found the plaintiffs' expert lacked the requisite expertise on credentialing.[19] Second, but more importantly, the plaintiffs needed to get to Beebe's peer review and credentialing committee records to assist their case but such records are and were statutorily privileged and inaccessible to plaintiffs.[20] Consequently, there was no admissible evidence and Beebe's summary judgment motion had to be granted. It may develop that a similar barrier may or may not confront plaintiffs in this case on some of their claims, but on a motion to dismiss, such a concern is premature.

At oral argument, defendants cited *Conway v. A.I. Dupont Hospital for Children.*[21] They contended that it supports their argument that Delaware law limits direct medical negligence claims against health care providers. In *Conway,* the District Court in Pennsylvania applied Delaware law and granted defendants' motion for summary judgment in a medical negligence action.[22] The court granted summary judgment because Delaware law requires expert medical testimony to show that claimed medical negligence was the, or a, proximate cause of injury.[23] The plaintiff's expert could not provide that causative link. As a result, his case failed.[24] There is nothing in *Conway* to support the defendants' argument about limitations on claims against hospitals. What is also important in reviewing these four cases is none involved a motion to dismiss. Two involved motions for summary judgment, *Conway* and *Riggs,* and two were Supreme Court rulings regarding the trial court's evidentiary rulings, *Register* and *Greene.* None noted any jurisprudence limiting direct negligence claims against hospitals.

Counts IV and V of the complaint allege negligence by these defendants for failure to (1) select and retain competent physicians and nurses, (2) adopt adequate rules and policies to assure quality care in cases such as Thomas' condition, (3) have in place a policy or procedures to assure that defendants would assess and treat Thomas consistent with the standard of care, (4) oversee and supervise physicians and nurses, and (5) monitor the competence of the health care providers who were acting as

**17.** *Id.* at *2.

**18.** 2000 WL 303308 (Del.Super. Feb. 20, 2000).

**19.** *Id.* at *4.

**20.** *Id.* at *5; 24 *Del. C.* § 1768.

**21.** 2009 WL 57016 (E.D.Pa. Jan. 6, 2009).

**22.** *Id.* at *5–12.

**23.** 18 *Del. C.* § 6853.

**24.** *Conway,* 2009 WL 57016, at *16.

agents or servants of the hospital.[25] If anything, directly or indirectly, the four cases cited by the institutional defendants provide precedent for the claims the plaintiffs made.

The complaint explicitly sets forth an allegation that the institutional defendants, acting by and through their agents or servants knew or had reason to know of the facts and risks of post operative complications of children with OSA.[26] It further alleges that children with OSA have an increased risk of depressive respiratory effects hours after emergence from anesthesia, but the hospital failed to assess Thomas for this risk or treat him in accordance with the required standard of care. To some degree these allegations sound more in the traditional *respondeat superior* vein, but they dovetail with the allegations noted in the preceding paragraph.

At this stage, the plaintiffs do not have to produce evidence by way of depositions, expert reports, affidavits, etc., to support these allegations. These allegations are sufficient to put the institutional defendants on notice of the claims against them and to allow them to prepare a defense to the claims. The institutional defendants' motion to dismiss Counts IV and V of the complaint is **DENIED**.

### Negligent Infliction of Emotional Distress

█ In Count VIII plaintiffs make a claim against all defendants for negligent infliction of emotional distress. They assert that as a result of defendants' negligence they were within the zone of danger as their son's limp body was discharged and taken out of the hospital in a wagon and "suffered outrage" after seeing him in that condition.[27] They allege suffering bodily injury, sickness and mental illness.[28] All of the defendants seek dismissal of Count VIII contending the plaintiffs were not in the "zone of danger" and do not allege they were in fear for own their safety or were at risk of being harmed themselves. Plaintiffs implicitly concede there could be an issue of whether they were in the zone of danger by arguing that this Court should adopt the "bystander—liability" rule utilized in New Jersey.[29] Under Delaware law up to this point, to make a claim for negligent infliction of emotional distress, three elements have been needed: (1) negligence causing fright to someone; (2) in the zone of danger; and (3) producing physical consequences to that person as a result of the contemporaneous shock.[30]

The "zone of danger" concept was adopted by the Delaware Supreme Court in *Robb v. Pennsylvania Railroad Co.*,[31] when the Supreme Court abolished the then rule that to recover for negligent infliction, the plaintiff had to experience an impact as a necessary element of such a claim.[32] The plaintiff in *Robb* was not struck but her claimed physical injury arose from the fright caused by the alleged negligence of the railroad; namely, the

---

**25.** Pl.'s Compl. ¶¶ 32 and 35.

**26.** Pl.'s Compl. ¶ 31.

**27.** Pl.'s Compl. ¶ 43.

**28.** Pl.'s Compl. ¶ 43.

**29.** *Gendek v. Poblete*, 139 N.J. 291, 654 A.2d 970, 972 (1995) ("[when] a person, not otherwise a direct object of a tortfeasor's negli-

gence, experiences severe emotional distress when another person suffers serious or fatal injuries as a result of that negligence [there can be recovery].")

**30.** *Rhinehardt v. Bright*, 2006 WL 2220972, at *5 (Del.Super. Jul. 20, 2006).

**31.** 210 A.2d 709 (Del.1965).

**32.** *Id.* at 714.

negligent leaving of a rut near the tracks which caused her car to stall on the tracks. She jumped out of the car just before a train hit it. In dealing with a directly affected plaintiff, the Supreme Court acknowledged:

> [W]e are not here concerned with the situation, such as existed in the *Williamson* case, wherein fright arose from the peril of another and the plaintiff was not in the path of the danger created by the negligence asserted. That segment of the problem has likewise given rise to contrariety of opinion. We lay that question aside for another day, interesting as it may be, because the instant case does not require us to decide it.[33]

■ An issue left open in *Robb* for another day is now here: is there a cause of action for negligent infliction of emotional distress when the fright is that of a third person and it arose from the peril of another and the plaintiff was not in the path of danger created by the claimed negligence? The Court holds that a claim for negligent infliction of emotional distress is a viable cause of action where the negligence is continuing and occurs in the third person's presence.

Since *Robb*, there has been one case which has addressed the issue of third-party recovery for negligent infliction of emotional distress in the context of alleged medical negligence. In *Snavely v. The Wilmington Medical Center*,[34] this Court held that fear for the safety of another person is not compensable under Delaware law.[35] In *Snavely*, a father sought compensation for such a cause of action where he observed the caesarian delivery of his son. An hour later, he saw the badly bruised baby. The baby died two and a half months later.

This Court reviewed prior cases where parents had sought recovery for negligent infliction but in each had not witnessed the act injuring their child. It is not clear from the *Snavely* opinion, however, if the father witnessed the actual act which led to the baby's bruising. The Court reiterated that it found Delaware law to be that the plaintiff had to be the one to fear for his or her own safety.

Other decisions have addressed third party recovery but not as directly as *Snavely*. In *Mancino v. Webb*,[36] the parents of a child who was hit by another child, but who had not witnessed the incident, could not recover since they were not in the zone of danger of their child.[37] *Pritchett v. Delmarva Builders, Inc.*,[38] ruled out a cause of action for negligent infliction of emotional distress when home owners came home to find their house burning. The Court found they were not in the zone of danger but it was more troubled in allowing such a cause of action where property damage was the underlying cause of their claim.[39] Finally, in *Doe v. Green*,[40] this Court ruled out a negligent infliction of emotional distress claim by the parents of a minor who had been repeatedly raped by an adult babysitter. The parents were not witnesses to any of the

---

**33.** *Id.* at 711.

**34.** 1985 WL 552277 (Del.Super. March 18, 1985) (the defendants did not cite this case).

**35.** *Id.* at 4.

**36.** 274 A.2d 711 (Del.Super.1971).

**37.** *Id.* at 714.

**38.** 1998 WL 283376 (Del.Super. Feb. 27, 1998).

**39.** *Id.* at 3.

**40.** 2008 WL 282319 (Del.Super. Jan. 30, 2008).

rapes. As such, the Court said they were not in the zone of danger.[41]

The Court in *Snavely* referred to several California cases, particularly *Dillon v. Legg.*[42] In that case the California Supreme Court enunciated a rule allowing third party recovery. Factually, the case involved a claim for negligent infliction by a mother who saw her child run over. In allowing the claim, the *Dillon* Court addressed the obvious important issue of allowing third party or bystander recovery: foreseeability. The court set out three factors to be taken into account in connection with such claims:

> In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship of the presence of only a distant relationship.[43]

Years later and subsequent to *Snavely*, the California Supreme Court found it nec-essary, to clarify its ruling in *Dillon*. Jurisprudence since *Dillon* had limited it to sudden occurrences. The Supreme Court abolished that distinction in *Ochoa v. Superior Court of Santa Clara County.*[44] In *Ochoa*, the mother of a minor son in the custody of the county jailers witnessed, before he died, her son's progressing deteriorating condition, including seeing him in agony and asking for and not receiving better medical care. In eliminating the sudden occurrence "rule" the *Ochoa* Court said: "Such a restriction arbitrarily limits liability when there is a high degree of foreseeability of shock to the plaintiff and the shock flows from an abnormal event, and, as such, unduly frustrates the goal of compensation—the very purpose which the cause of action was meant to further."[45]

On the other hand, Texas does not allow "bystander" recovery in medical negligence cases.[46] The court, when reaching that holding, noted several other states have made similar holdings in medical negligence cases.[47]

This Court sees two key factual distinctions between this case and *Snavely*. Before addressing them, however, this Court views that, unlike the Court in *Snavely*, the issue of third party recovery for negligent infliction was not resolved in *Robb*, but explicitly left open "for another day." Arguably that day arrived in *Snavely*, but this Court finds the factual distinctions between the two cases make a material difference and indicates in certain, discrete factual settings, there can be third party recovery.

---

41. *Id.* at 2.

42. 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968).

43. *Id.* at 740–41, 69 Cal.Rptr. 72, 441 P.2d 912.

44. 39 Cal.3d 159, 216 Cal.Rptr. 661, 703 P.2d 1 (1985).

45. *Id.* 216 Cal.Rptr. 661, 703 P.2d at 7.

46. *Edinburg Hospital Authority v. Treviño*, 941 S.W.2d 76 (Tex.1997).

47. *Id.* at 80–81.

In *Snavely*, there appears to have been a particular, moment-in-time act of negligence during the delivery of the baby. The father saw the after-affects. Arguably, so did the Armstrongs. But there is a major difference. Thomas was discharged in an "asleep" condition. That was due to a number of things which operated to act cumulatively: the drugs used in the particular operation, the post-operative discharge orders, the administration of drugs to calm Thomas down and put him back to sleep, discharging an "asleep" five year old, and placing him in a wagon to be transported from his bed to his parents car.

Up until Thomas was placed in his parents' car, he was under the control of the institutional defendants. Discharging him in his condition was something these defendants could have not allowed or stopped (for purposes of the motion to dismiss, the Court has to assume the negligence of all of the acts alleged). The initial administration of drugs pre-op, during the operation and post-operatively was within a very few hours, three at most, and at this stage it is impossible to segregate out any act of negligence from another leading up to the alleged act of discharging Thomas while still asleep. This results in the Court, at this stage, being unable to pinpoint various actors and their acts as distinct from other persons and acts.

Without doubt, the adult plaintiffs were not in fear for their own safety. They were, however, witnessing and "outraged" at seeing Thomas' limp body in a wagon. They were witnessing negligence *as it continued to happen*, minimally the negligent act of discharging Thomas in his condition, if not the cumulative negligence preceding what they saw. Nor can that cumulative negligence be isolated from the suggestively related cause of death only a few hours later.

These factors alone distinguish *Snavely*, as it appears there was a discrete-in-time act of negligence and what the father saw were the after-effects. But what is also not clear from *Snavely* is whether the father suffered any physical injury arising from the emotional distress. It may be that the Court believed it necessary to address just the principle of third party recovery and did not have to discuss that. In any event, it is not noted in *Snavely* that physical injury was alleged. Here it is alleged and meets that criteria—suffering physical injury—required for recovery for this cause of action.

The three factors enunciated in *Dillon*, as modified in *Ochoa* apply:

1. The plaintiffs—the Armstrongs—were located at the scene of the negligent treatment of Thomas—the discharge with its cumulative alleged prior acts of negligence.

2. There was shock and "outrage" by the Armstrongs seeing Thomas discharged in his condition and their observation of that condition was contemporaneous. They could see his condition. It was not reported to them by others.

3. The adult Armstrongs were Thomas' parents. No closer relationship is possible.

In sum, the plaintiffs have pled a cause of action for negligent infliction of emotional distress against the defendants. To the extent that *Snavely* ruled out any third party recovery for negligent infliction of emotional distress, this Court respectfully disagrees. A close examination of *Snavely*, however, may indicate that this Court reached its result because the father did not witness the negligent act. That would be consistent with Delaware law. Insomuch as these plaintiffs were witnessing firsthand an ongoing act of negligence— the discharge—*Snavely* is arguably dicta.

The defendants' motion to dismiss Count VIII is **DENIED.**

### *Conclusion*

For the above-listed reasons, defendants' motion to dismiss is **DENIED** as to plaintiffs' demand for punitive damages in Counts I and II; **DENIED** as to Counts IV and V; and **DENIED** as to Count VIII.

**IT IS SO ORDERED.**